THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v. JOHN HENRY TUNE, DEFENDANT-RESPONDENT.

Argued May 25, 1953—Reargued June 9, 1953—
Decided June 25, 1953.

*Mr. Edward Gaulkin,* Essex County Prosecutor, argued the cause for the appellant (*Mr. Albert M. Ash,* Cape May County Prosecutor; *Mr. J. Victor Carton,* Monmouth County Prosecutor; *Mr. Mitchell H. Cohen,* Camden County Prosecutor; *Mr. Donald G. Collester,* Passaic County Prosecutor; *Mr. John D. Collins,* Morris County Prosecutor; *Mr. E. Milton Hannold,* Gloucester County Prosecutor; *Mr. Herbert T. Heisel, Jr.,* Hunterdon County Prosecutor; *Mr. Fred-*

*erick T. Law,* Hudson County Prosecutor; *Mr. Robert A. Lederer,* Ocean County Prosecutor; *Mr. H. Russell Morss, Jr.,* Union County Prosecutor; *Mr. Harold T. Parker,* Burlington County Prosecutor; *Mr. John H. Pursel,* Warren County Prosecutor; *Mr. Lewis P. Scott,* Atlantic County Prosecutor; *Mr. William R. Smith,* Salem County Prosecutor; *Mr. George H. Stanger,* Cumberland County Prosecutor; *Mr. Harry L. Towe,* Deputy Attorney-General, Bergen County; *Mr. Mario H. Volpe,* Mercer County Prosecutor; *Mr. T. Girard Wharton,* Somerset County Prosecutor, of counsel; *Mr. Alex Eber,* Middlesex County Prosecutor; *Mr. Adrian B. Hommell,* Sussex County Prosecutor; and *Mr. Melvin P. Antell,* Legal Assistant Prosecutor of Essex County, on the brief).

*Mr. Charles Danzig,* argued the cause for the respondent (*Mr. Edward J. Gilhooly,* of counsel).

The opinion of the court was delivered by

VANDERBILT, C. J. On October 7, 1952 the grand jury of Essex County returned an indictment charging the defendant with the murder of William Prather. The body was discovered on August 23, 1952 in the basement of the decedent's home. The defendant was arrested by the police in Newark shortly after noon on the same day and taken to Newark Police Headquarters for questioning. There he made an oral statement to the police, admitting that he had committed the crime, and then signed a 14-page confession which had been prepared in longhand from his statements by one of the detectives from the county prosecutor's office. The prosecutor's office later obtained signed statements from persons other than the defendant.

On October 30, 1952 the Essex County Court appointed two attorneys to act as counsel for the defendant. On January 30, 1953 counsel applied to the County Court on notice to the county prosecutor for:

"An order directing that a subpoena issue under the order of this Court directed to you and requiring you to produce before the Court

at a time prior to the trial and as fixed by the Court, any statement or statements in writing which will, at the trial, be alleged to have been signed by the above named defendant, together with any and all statement or statements signed by any other person in connection with the homicide set forth in the indictment, to the end that any of such statements may be inspected by the attorneys for the defendant prior to the trial."

In the same motion counsel made another application for an order:

"Directing you, as Essex County Prosecutor, to disclose to the undersigned, as attorneys for the defendant, the names and addresses of all persons having knowledge of relevant facts in connection with the offense alleged in the aforesaid indictment; or, in the alternative, that an order issue directing you, as Essex County Prosecutor, to submit to interrogatories wherein you shall set forth copies of all written statements obtained by you from the defendant or any other person having any knowledge of relevant facts concerning the charges laid in the aforesaid indictment; or, in the alternative again, that an order issue directing you, as Essex County Prosecutor, to permit the attorneys for the defendant, or someone acting on their behalf, to inspect and copy any statement or statements in writing which may have been allegedly signed by the above named defendant, together with any and all statement or statements signed by any other person in connection with the homicide set forth in the indictment."

The motion set forth the following grounds for the application:

"(a) The information sought by the attorneys for the defendant is necessary for the proper preparation of the defense, the preparation for trial, and the presentation of the defense at the trial of the aforesaid Indictment.

(b) A denial of the production of this information and a denial of the right of inspection of any of the aforementioned statements will result in an injustice or undue hardship to the defendant, and be contrary to the Rules promulgated by the Supreme Court of New Jersey.

(c) The granting of the relief sought by this Motion is within the discretion of this Court and the circumstances of this case require that such discretion be exercised in favor of this Motion."

Attached to the motion was an affidavit of counsel setting forth the reasons why the application should be granted.

The State opposed the applications, but filed no affidavits in opposition thereto. On February 3, 1953, the court filed

an opinion granting the defendant the right to inspect his confession, but denying his application to inspect the other statements in the possession of the prosecutor. Before such an order was entered, the State, on February 18, 1953, moved "for a reopening and continuance of the motion," accompanying said motion with affidavits of two police officers, a doctor, and a citizen witness. The court, although granting the State the right to file these affidavits, declined to alter its opinion, and thereupon entered an order granting the defendant the right to inspect his own confession but denying inspection of the statements of others. The State's petition for certification and the defendant's cross-petition were both granted by us.

We are first faced with an objection raised by the defendant to our jurisdiction to review a matter where no final judgment has been entered in a trial court, *Rule* 1:5–3. It is sufficient to note, however, that we have not hesitated to waive the rule and to decide similar matters where to do so would best serve the ends of justice, *Hendrikson v. Koppers Co. Inc.*, 11 *N. J.* 600, 605 (1953). Here an important question of law has been raised by a defendant under indictment for having taken the life of another as to his rights of discovery prior to trial. In view of the order entered by the trial court, the question is of such moment that we should resolve it at this time, for otherwise it would never be litigated. If the defendant were acquitted, the State could not appeal, and if the defendant were convicted, he would have no occasion to appeal from the order granting him an inspection of his confession.

The questions before us are whether the defendant is entitled to an inspection of (1) statements signed by persons other than the defendant, and (2) statements signed by the defendant.

I.

Defendant argues that in keeping with the modern trend toward liberal discovery in civil proceedings we should grant him the unqualified right to an inspection of all papers

and other documents in the possession of the State, in this case statements made to the prosecutor by witnesses. With this we cannot agree. Such an argument completely ignores the fundamental difference between civil and criminal proceedings. In any judicial proceedings, civil or criminal, the purpose of broad discovery is "to promote the fullest possible presentation of the facts, *minimize opportunities for falsification of evidence,* and eliminate the vestiges of trial by combat," 60 *Yale L. J.* 626 (emphasis supplied). "Liberal procedures for discovery in preparation for trial are essential to any modern judicial system in which the search for truth in aid of justice is paramount and in which concealment and surprise are not to be tolerated." *Lang v. Morgan's Home Equipment Corp.,* 6 *N. J.* 333, 338 (1951). However, such liberal fact-finding procedures are not to be used blindly where the result would be to defeat the ends of justice. In criminal proceedings long experience has taught the courts that often discovery will lead not to honest fact-finding, but on the contrary to perjury and the suppression of evidence. Thus the criminal who is aware of the whole case against him will often procure perjured testimony in order to set up a false defense, *State v. Rhoads,* 81 *Ohio St.* 397, 423–4, 91 *N. E.* 186, 192, 27 *L. R. A., N. S.* 558 (*Sup. Ct.* 1910); *Commonwealth v. Mead,* 12 *Gray* 167, 170 (*Mass.* 1858). Another result of full discovery would be that the criminal defendant who is informed of the names of all of the State's witnesses may take steps to bribe or frighten them into giving perjured testimony or into absenting themselves so that they are unavailable to testify. Moreover, many witnesses, if they know that the defendant will have knowledge of their names prior to trial, will be reluctant to come forward with information during the investigation of the crime, *People v. Di Carlo,* 161 *Misc.* 484, 485–6, 292 *N. Y. S.* 252, 254 (*Sup. Ct.* 1936). All these dangers are more inherent in criminal proceedings where the defendant has much more at stake, often his own life, than in civil proceedings. The presence of perjury in criminal proceedings today is extensive despite the efforts of the courts to eradi-

cate it and constitutes a very serious threat to the administration of criminal justice and thus to the welfare of the country as a whole. *Hibschman, "You Do Solemnly Swear! Or That Perjury Problem,"* 24 *J. Crim. L. and Criminology* 901 (1934). To permit unqualified disclosure of all statements and information in the hands of the State would go far beyond what is required in civil cases; it would defeat the very ends of justice.

In considering the problem it must be remembered that in view of the defendant's constitutional and statutory protections against self-incrimination, the State has no right whatsoever to demand an inspection of any of his documents or to take his deposition, or to submit interrogatories to him. As stated in *State v. Rhoads, supra,* at 91 *N. E.* 192:

"The state cannot compel the prisoner at the bar to submit his private papers or memoranda to the state for use or even examination, for he cannot be required to testify in the case, nor to furnish evidence against himself. Then, why should the accused be allowed to rummage through the private papers of the prosecuting attorney? Neither the sublime teachings of the Golden Rule, to which we have been referred, nor the supposed sense of fair play, can be so perverted as to sanction the demands allowed in this case."

See also *State v. Bunk,* 63 *A. 2d* 842, at 844 (*N. J. Cty. Ct.* 1949):

"The element of reciprocity is present in the conduct of civil causes. Each party may examine the other, force disclosure of material evidence and thus reduce to a minimum the element of surprise or chance in the trial. In criminal causes no such reciprocity is possible. The State could not examine the defendant before trial without his consent, nor could any rule of court force such examination."

Except for its right to demand particulars from the defendant as to any alibi on which he intends to rely, *Rule 2:5–7,* the State is completely at the mercy of the defendant who can produce surprise evidence at the trial, can take the stand or not as he wishes, and generally can introduce any sort of unforeseeable evidence he desires in his own defense. To allow him to discover the prosecutor's whole case against

him would be to make the prosecutor's task almost insurmountable.

The rule in the federal courts does not differ from ours. *Federal Rules of Criminal Procedure* 16 and 17(c) are applicable, the latter being identical to our *Rule* 2:5–8(c) here involved. *Federal Rule* 16, which has not been adopted in this State, provides:

> "Upon motion of a defendant at any time after the filing of the indictment or information, the court may order the attorney for the government to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, obtained from or belonging to the defendant or obtained from others by seizure or by process, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable."

*Federal Rule* 17(c) and our *Rule* 2:5–8(c) provide in part:

> "The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."

The federal courts have on many occasions held that the defendant has no unqualified right of inspection. In *Goldman v. U. S.*, 316 *U. S.* 129, at *page* 132, 62 *S. Ct.* 993, at *page* 995, 86 *L. Ed.* 1322 (1942), the United States Supreme Court stated that the accused had no right to inspect prior to trial the notes and memoranda of federal agents, saying that "The judge was clearly right in his ruling * * * as the petitioners should not have had access, prior to trial, to material constituting a substantial portion of the Government's case." In *U. S. v. Garsson*, 291 *F.* 646, 649 (*S. D. N. Y.* 1923), Judge Learned Hand in his opinion for the court stated:

> "Under our criminal procedure the accused has every advantage. While the prosecution is held rigidly to the charge, he need not disclose the barest outline of his defense. He is immune from question or comment on his silence; he cannot be convicted when

there is the least fair doubt in the minds of any one of the twelve. Why in addition he should in advance have the whole evidence against him to pick over at his leisure, and make his defense, fairly or foully, I have never been able to see. * * * Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime."

This same judge remarked in his opinion for the court in *U. S. v. Dilliard*, 101 *F. 2d* 829, 837 (*C. C. A.* 2 1938):

"The defendants seem to suppose that they had the privilege of roaming about at will among any memoranda made by the prosecution in preparation for trial: that indeed is not an uncommon illusion, but it has nothing whatever to support it."

See *U. S. v. Muraskin*, 99 *F. 2d* 815, 816 (*C. C. A.* 2 1938). Even under our rules of civil procedure a party cannot obtain access to the work product of the opposing lawyer, except in unusual cases:

"* * * The deponent shall not be required to produce or submit for inspection any writing obtained or prepared by the adverse party, his attorney, surety, indemnitor, or agent in anticipation of litigation and in preparation for trial unless the court otherwise orders on the ground that a denial of production or inspection will result in an injustice or undue hardship; nor shall the deponent be required to produce or submit for inspection any part of a writing which reflects an attorney's mental impressions, conclusions, opinions, or legal theories, or, except as provided in *Rule* 3:16–34, the conclusions of an expert." *Rule* 3:16–2.

See *Hickman v. Taylor*, 329 *U. S.* 495 (1947), affirming 153 *F. 2d* 212, establishing the doctrine which has been substantially incorporated into our rules, 3:16–2, *supra*.

Clearly then there is even more reason for withholding such documents in criminal proceedings:

"As already pointed out the Rules of Criminal Practice contain no provision for the liberal discovery practice created by the Civil Rules. If there is no right to the kind of documents sought here in civil cases, where discovery practice exists, in the absence of injustice or undue hardship, there is certainly more reason for withholding such documents from inspection in criminal causes. There-

fore, confessions, investigation reports and statements of witnesses obtained in a criminal prosecution might well be classed as 'the work product of the prosecutor' and granted protection against inspection by the defense in advance of trial." *State v. Bunk*, 63 *A. 2d* 842, *supra*, at 845.

██ We therefore conclude that the defendant has no right to discovery of the work product of the prosecutor, in this case the statements signed by others than the defendant. Such documents can only in the most exceptional cases and in the most unusual circumstances be turned over to the defendant for inspection. No such circumstances are shown here.

## II.

The next question is whether the defendant has a right in this case to inspect his own confession under *Rule* 2 :5–8 (*c*), quoted above, which is identical to *Rule* 17 (*c*) of the *Federal Rules of Criminal Procedure*. The defendant's confession is necessarily treated in a different light from that of the other documents in the hands of the prosecutor. Thus, in *Shores v. U. S.*, 174 *F. 2d* 838, 845, 11 *A. L. R. 2d* 635 (*C. A.* 8 1949), Judge Johnsen, in his opinion for the court, stated:

"The court's relation to and control of a confession, by virtue of the nature and status of such an instrument, would seem to be different inherently than as to the ordinary elements of the Government's case. In the first place, the obtaining of a confession is made possible only because of the custody which the law affords. Again, the law recognizes the delicacy involved in such a situation and imposes a special official responsibility in relation to its taking. *Objective standards of validity must also be met, and it is only on the basis of the confession being possessed of such a validity that it is at all recognized as legally bespeaking any truth.* And as an implement of conviction, its truth certainly ought to have the strength to stand up, even after a defendant's rereading of it. Such a statement by a defendant, therefore, manifestly is more than a mere part of the 'catch-as-catch-can' preparation or personal 'work product' of a case, into which our American forensic concepts have been traditionally reluctant, more so even in criminal than in civil cases, to permit any adversarious prowling."

See *State v. Cicenia*, 6 *N. J.* 296, 300 (1951).

 We have in New Jersey set up adequate safeguards to protect the criminal defendant from being prejudiced by the admission in evidence of a statement signed by him which has not emanated from his own free will. Such a statement offered by the State must first pass the test of admissibility. The burden is on the State to show that the confession was voluntary. Here the trial judge hears the evidence and determines the voluntariness of the proffered confession. As stated in *State v. Vaszorich*, 13 *N. J.* 99 (1953) : "The essence of the inquiry is whether in obtaining the confession there was observance of 'that fundamental fairness essential to the very concept of justice,' for 'the aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false,' *Lisenba v. People of the State of California*, 314 *U. S.* 219, 62 *S. Ct.* 280, 86 *L. Ed.* 166 (1941)." "Whether a statement or confession is, in fact, voluntary depends on the facts of the individual case and the determination of the trial court will not be disturbed on appeal where the evidence is adequate to sustain it," *State v. Cooper*, 10 *N. J.* 532, 550 (1952). "The true criterion is the actual state of mind of the accused at the time the confessions were made * * *," *State v. Cole*, 136 *N. J. L.* 606, 612 (*E. & A.* 1947).

 At the preliminary hearing as to the admissibility of the confession police officers and other witnesses can be called to the stand to testify as to the circumstances under which the confession was signed. The defendant can take the stand himself or produce witnesses to dispute the voluntary character of the confession. It is only after the trial judge has heard this testimony and decided that the confession was in fact voluntary that it is admitted in evidence, and then after admission into evidence the confession is given whatever weight the jury decides to accord it. It may totally disregard it, or it may determine that the confession is trustworthy in whole or in part.

In view of such safeguards it certainly cannot be seriously contended that a defendant in criminal proceedings is not

properly protected in the use of his confession. Dean Wigmore takes the view that liberal rules as to the admission of confessions should be adopted:

"In the first place, the only real danger and weakness in a confession—the danger of a false statement—is of a slender character, and the cases of that sort are of the rarest occurrence. No trustworthy figures of authenticated instances exist; but they are concededly few. Now if it were a question of receiving the confession as conclusive, *i. e.*, as equivalent to a plea of guilty, we might well prefer to be extremely cautious (as under the early traditional practice already described), and let the trial take its ordinary course. But as it is a mere matter of giving or not giving one more piece of evidence to the jury, as it is impossible to determine beforehand the real weight of any confession, and as the accused has ample opportunity of offering any facts affecting the weight of the confession, it is entirely unnecessary to bar out all confessions whatever by broad and artificial tests, merely on account of this slender and rare risk of falsity. To employ an anomalous occurrence as the basis of indiscriminate exclusion is not reasonable. It is simply, in the language of Chief Justice Paxson already quoted, an exhibition of sentimentalism toward the guilty." (3 *Wigmore on Evidence* (3rd ed. 1940), 359.)

The confession obtained shortly after apprehension is more apt to be trustworthy since it is a spontaneous statement made before the accused has had the opportunity to converse with the older habitues of the jail and others who may aid him in preparing a falsified defense, and encourage him to give perjurious testimony. Thus Dean Wigmore, in upholding the legality of continuous questioning by police, states:

"In the first place, an innocent person is always helped by an early opportunity to tell his whole story; hundreds of suspected persons every day are set free because their story thus told bears the marks of truth. Moreover, and more important, every guilty person is almost always ready and desirous to confess, as soon as he is detected and arrested. This psychological truth, well known to all criminal trial judges, seems to be ignored by some Supreme Courts. The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature. It is natural, and should be lawful, to take his confession

at that moment—the best one. And this expedient, if sanctioned, saves the State a delay and expense in convicting him after he has reacted from his first sensations, has yielded to his friends' instinct to struggle to save himself by the aid of all technicalities." (Ibid. 319)

Our experience in *State v. Cooper*, 2 *N. J.* 540 (1949) and 10 *N. J.* 532 (1952), commonly known as Trenton Six Case, bears out Dean Wigmore's point of view, for there on the sentencing of Cooper he voluntarily reaffirmed his earlier confession implicating most of the defendants.

If we were reasoning in a vacuum we might well be persuaded to reach the conclusion contended for by the defendant, but we are bound to take into account the continually increasing amount of crimes of violence that are occurring in this State. Statistics compiled by the Federal Bureau of Investigation, *Urban Crime Trends*, 1951-52, reveal that in New Jersey as well as in the United States as a whole we are faced with an ever-increasing crime rate. In this State reports from 134 cities reveal that in 1952 there was a 12.1% increase in major crimes over the year 1951. The increase was 0.4% for rape, 0.1% for robbery, 9.8% for aggravated assault, 23.1% for burglary—breaking or entering, 8.2% for larceny and theft, and 9.3% for auto thefts. The overall increase of 12.1% in New Jersey is 4% higher than the increase in the United States as a whole. Thus, although we are ever alert to protect the rights of the individual accused, we should remember that the people of this State must also be protected. In weighing the rights of the individual and those of the State we must not be carried away in our desire to protect the individual accused to such an extent that the safety of the public is jeopardized. We are bound also to take notice of the fact that in general our police in common with the police of other states have not yet received the specialized training in crime detection that the changed methods of communication, transportation, use of modern firearms and gang organizations have made necessary to the administration of criminal justice, though commendable progress in that direction is manifest in a number of places.

We can well understand the desire of defense counsel to see the confession in every case particularly where the defendant after having made the confession finds on reflection it is better for himself to forget it. But the wishes and convenience of defense counsel are not the test. This question of the right of the defendant to a pretrial discovery of his own confession is not a novel problem for this court, the same point having been raised in *State v. Cicenia*, 6 *N. J.* 296 (1951), where the court unanimously held:

"A defendant has no unqualified absolute right to an inspection of his confession. On the contrary, his application for an inspection is addressed to the sound judicial discretion of the trial court to be exercised only as the interest of justice may require and with the thought in mind that the question of the admissibility of the confession is always a matter for determination at the trial." (At *page* 301)

Although some courts refuse to permit inspection in any circumstances, 20 *Tulane L. R.* 133, our rule appears to be consistent with that of many other jurisdictions, *State v. Haas*, 188 *Md.* 63, 51 *A. 2d* 647 (*Ct. App.* 1947); *People v. Skoyec*, 50 *N. Y. S. 2d* 438 (*Sup. Ct.* 1944); *State v. Leland*, 190 *Ore.* 598, 227 *P. 2d* 785 (*Sup. Ct.* 1951), affirmed 343 *U. S.* 790, 72 *S. Ct.* 1002, 96 *L. Ed.* 1302.

"An exercise of the power to require the Government to furnish the defendant with a copy of his confession would of course, be wholly a matter of judicial grace. There could hardly be any need to exercise it, where the attempt to obtain a copy manifestly was simply a part of a blunderbuss roving, so that the privilege thereby would tend to reach the stature of an absolute right. But there may be cases where the circumstances are such that the judicial conscience properly feels that the interest of justice will be best served by allowing the defendant before trial to have a copy of his confession." (*Shores v. U. S., supra*, at 845.)

Louisiana is the only state in the Union where it is claimed that there exists a right to an inspection of a confession, *State v. Dorsey*, 207 *La.* 928, 22 *So. 2d* 273 (*Sup. Ct.* 1945). The *Dorsey* case appears to be grounded on its own particular facts, for at *page* 285 of the opinion the court says:

"It is not our intention to overrule the prior jurisprudence of this State, and particularly the various cases cited by counsel for the State, in each of which defendant was denied pre-trial inspection of written confessions of codefendants, written statements of witnesses, or police reports in the hands of a sheriff, police department, or district attorney, and we do not overrule these cases.

However, we are of the opinion that in this case the rule filed on behalf of defendant should have been made absolute * * *."

It has also been recognized in Louisiana that this case expresses a view inconsistent with the holdings in most states; 20 *Tulane L. R.* 133, 135 (1945). Its view was rejected in *State v. Leland,* 190 *Ore.* 598, 227 *P. 2d* 785, *supra.*

The defendant also relies on the English practice of full discovery in criminal matters. The criminal law of England differs materially from that of the United States. "The English Criminal Procedure developed its traditional accusatory characteristics largely because it relied upon a system of private prosecution." *Ploscowe, The Development of Present-Day Criminal Procedures in Europe and America,* 48 *Harvard L. R.* 433, 469. Moreover, its system of crime detection and investigation is far more advanced than anything known in this country except in the federal field, and the law-abiding instincts of the population are in marked contrast to the disrespect for law which has long characterized the American frontier and which has not yet disappeared as the criminal statistics indicate in certain segments of the American population.

The question next arises whether the trial judge abused his discretion in granting defendant the right to inspect his confession. The only proof in support of the application was an affidavit by the defendant's attorneys stating that they had been informed by the defendant that the confession was obtained through threats of violence, that the statement was not read to him nor did he read it, that the defendant could tell counsel nothing of its contents, that the defendant was suffering from a mental disorder when he signed it, and that he did not have benefit of counsel at that time, nor was he aware of his rights in the matter. The affidavit further stated:

"In our interview with the accused we ascertained from him that he had signed a statement which had been exacted from him through force, duress and threats of violence to him and members of his family; that such statement was not read to him and that he did not read the statement before signing it; that he could tell us nothing about the contents of any statement that he may have signed; that he was suffering from mental disorder at the time he signed such statement; did not have the benefit of counsel at that time or appreciate or be conscious of his rights in the matter.

Our investigation thus far has disclosed material discrepancies between the facts as we have been able to ascertain them and the theory of the homicide indicated by the State, and to ascertain the real truth of the matter and to prevent an injustice from being done it is, in our opinion, of the utmost importance that we be permitted to examine and make a copy of the alleged confession and statements referred to in the Motion."

In opposition to this application the State presented four affidavits. That of Detective Lieutenant Neidorf stated that immediately after apprehension the defendant orally admitted commission of the crime, that the defendant was taken to the scene of the murder where he reenacted the crime, that he was returned to the police station and after examination by a doctor his statement was taken in longhand by the lieutenant. After completion of the written confession the defendant read it aloud in the presence of several police officers and stated that the contents were true. In addition it was read aloud to him by one of the officers and again the defendant repeated that its contents were true. The affidavit further states that during all this time the defendant "appeared to be entirely sober, well-oriented as to time, places and events; he was logical of thinking, rational, responsive to the questions, and intelligent in his answers; he was entirely coordinated in his faculties; and appeared to be fully cognizant of the seriousness of the crime with which he was being charged and the probable consequences." The affidavit of William F. Graef, Deputy Chief of Police of Irvington, corroborates the facts set forth in Lieutenant Neidorf's affidavit. He swears that he was present during the defendant's conversations with Lieutenant Neidorf, both at the police station and at the scene where the crime was reenacted. Doctor Kedersha's affidavit states that he exam-

ined the defendant prior to the making of the statement and that "I found John Henry Tune sober, very well oriented as to times, places and events, properly coordinated, and in full possession of all his mental faculties and not suffering from any mental disorders. In my opinion the prisoner was capable of making a statement to the police." The affidavit of William T. Hope, a disinterested civilian, shows that he was called to the police station and shown a written confession allegedly made by the defendant. He then took the defendant aside out of hearing of the officers and spoke to him in reference to the confession:

"In response to my questions, said John Henry Tune admitted to me that the confession shown him was his and that its contents were true; that none of the officers had made any promises to him; that none of them had threatened him with any personal violence before taking the confession; that he had read the confession aloud; and that it had been read aloud to him. At my request, said John Henry Tune again read the entire confession aloud. I asked him if there was anything he wanted, and he said 'no.' I asked him if the police had treated him all right, and he said 'yes.' I asked him if he had been permitted to talk to any friends or relatives and he said 'yes,' that he had been permitted to talk with his wife and uncle.

My interview with the defendant John Henry Tune, lasted about ten or twelve minutes. From my personal observation of said defendant, he appeared to be rational, responsive, cooperative, intelligent, and mentally as well as physically fit in every respect."

With these affidavits before it the trial court granted defendant's application for inspection of the confession, saying:

"No reasons appear for believing that the prosecutor will be hampered in his preparation for the trial or that there will be a failure of justice, or that the public interest will be adversely affected, if the inspection of defendant's confession is permitted. The case is set for trial two weeks hence and the prosecutor's investigation is undoubtedly entirely completed. The defendant has been in custody since his apprehension shortly after the alleged crime was committed. More than two months elapsed between the time of his apprehension and present counsel's entry into the case, during which time the prosecutor could have made, and undoubtedly did make, a full investigation of the case without any interference by, or impediment from many persons or source. There is no

suggestion that the defendant is in any way connected with any organized ring or criminal gang and therefore the idea of tampering with any witnesses seems extremely remote. * * * While no principle can be laid down that is applicable to all cases and each case must be decided on its own facts, this appears to be a proper case to permit the inspection and copying of the defendant's confession."

This language places the burden on the State to prove that it will be prejudiced or harmed by the defendant's inspection of the confession. We cannot agree with this interpretation of the law. *Rule* 2:5–8(c) provides that the court "may direct" the production of documents and statements. In the *Cicenia* case, *supra,* we interpreted this as meaning that the trial judge could order such an inspection "if in the sound discretion of the trial judge the interest of justice so requires." 6 *N. J.* 296, 301.

By sound discretion we mean a discretion in consonance with well established principles of law, one that is neither arbitrary, vague nor fanciful, *State v. Collins,* 2 *N. J.* 406, 411 (1949), *Hager v. Weber,* 7 *N. J.* 201, 212 (1951), *State v. Bunk,* 4 *N. J.* 482, 485 (1950). Since the matter rests in the discretion of the trial judge, it is incumbent on the moving party to produce such facts as will support the granting of the application. This rule is general in its application; in all proceedings, civil or criminal, the moving party has the burden of showing good cause for the exercise of the court's discretion. See *State v. Simon,* 113 *N. J. L.* 521, 526 (*Sup. Ct.* 1934), affirmed 115 *N. J. L.* 207 (*E. & A.* 1935); *Martin v. Lehigh Valley Railroad Company,* 114 *N. J. L.* 243 (*E. & A.* 1934); *Eilen v. Tappin's Inc.,* 14 *N. J. Super.* 162, 165 (*App. Div.* 1951), 4 *Moore's Federal Practice* (*2nd ed.*), sec. 34.08, page 2450. In discussing pretrial inspection of evidence in general it is stated in 23 *C. J. S.* 264: "In order to obtain an inspection, accused must show facts which would warrant the court's exercise of its discretion." In *People v. Skoyec, supra,* where the defendant had made an application to the court for an inspection of his confession on the ground that he did not remember what he had said at the time of his interrogation and on

the ground that without it it was impossible to form an opinion as to his sanity, the court denied the motion saying that the defendant had not shown sufficient facts to warrant the exercise of judicial discretion. In *U. S. v. Pete,* 111 *F. Supp.* 292 (*U. S. D. C., D. C.* 1953) the defendant moved to require the government to furnish him copies of statements or confessions made by him to the police. In denying the motion the court stated:

"Cases in the District of Columbia have permitted discovery of confessions and statements to the police, 4 *Barron & Holtzoff,* § 2032, *p.* 126, *note* 8, but in them the Court deemed it necessary in the interest of justice that the defendant should have such discovery. See *Shores v. United States, supra,* 174 *F.* 2d at *page* 845. *In the present case no showing of necessity has been made."* (Emphasis supplied.)

See *People v. Gatti,* 167 *Misc.* 545, 550, 4 *N. Y. S.* 2d 130 (*Gen. Sess.* 1938).

Applying this rule to the case at hand, we fail to see where the defendant has produced such facts as to warrant the exercise of the court's discretion to grant the application. First of all, the only affidavit in support of the motion was that of defendant's counsel, who give no reason why the defendant himself failed to make the affidavit. The affidavit is mere hearsay evidence of counsel repeating various statements made to them by their client. Such an affidavit would be inadmissible in a civil proceeding under *Rule* 3:43–3 which provides that "When a motion is based on facts not appearing of record, the court may hear the matter on affidavits presented by the respective parties, but the affidavits shall be made on personal knowledge and shall set forth only facts which are admissible in evidence and to which the affiant is competent to testify." We see no reason why this same reasoning is not applicable to a criminal proceeding, especially where as here the defendant is not asserting a right but requesting a privilege. Where, as here, the defendant relies in making his motion on certain facts, which are peculiarly within his own knowledge, it is incumbent upon him to bring these facts before the court in his

own affidavit and not to present them to the court in a hearsay affidavit of counsel. If the defendant wishes to have the privilege of inspecting his own confession, he should set forth the particular facts warranting the granting of this privilege in his own affidavit and the State should have the opportunity to use any such affidavit against him at the trial. He must assume the risk of having this affidavit used against him in the event that he has sworn falsely in his affidavit in order to obtain a desired result.

Moreover, the affidavit of counsel for the defendant, even if it were not hearsay and hence unacceptable in the circumstances, fails to disclose such facts as will support the granting of the application. Counsels' affidavit sets forth the following reasons: (a) The confession was exacted through force and threats of violence; (b) the confession was not read to him or by him prior to signing; (c) defendant could tell counsel nothing of its contents; (d) defendant was without benefit of counsel; (e) defendant was suffering from a mental disorder when he signed it; (f) there is a discrepancy between the facts as ascertained by counsel and those alleged by the State, which discrepancy can be cleared up only by an examination of the confession. As to (a) and (b), the affidavit sets forth no facts but merely conclusions. No particulars are given as to the threats or force, nor are we told the circumstances attending the signing of the confession. In opposition to this we have the four affidavits submitted by the State which establish without question the voluntariness of the confession and defendant's full knowledge of its contents. As to (c) and (d), it is sufficient to note that the law does not protect an accused against his own voluntary acts, *State v. Murphy*, 87 *N. J. L.* 515 (*E. & A.* 1915); *State v. Bunk*, 4 *N. J.* 461, 470 (1950). It is well settled in this State that the accused has the right to counsel only at his trial and that any statements that he makes to the police may be used against him, even though he was at the time without benefit of counsel. The fact that he may not recall the contents of the confession does not entitle him to an inspection of the confession. The failure

of the affidavit to set forth a reason for such lack of recollection and the overwhelming evidence of the State in opposition thereto make this statement unbelievable. As to (e), again we are given no facts but merely a conclusion. As far as (f) is concerned, this is again no valid basis for an inspection. For these reasons we are of the opinion that the defendant as the moving party has failed to carry the burden of proof of showing that in the interest of justice his application for an inspection of his confession should be granted by the court.

## III.

The principles enunciated on both questions here under consideration have received recognition in the "Tentative Draft of the Revision of the Rules Governing the Courts of the State of New Jersey," distributed May 11, 1953 to all the members of the bench and bar of this State. Therein is set forth a new rule recommended by the Committee on Criminal Procedure:

"3:5–11 Discovery and Inspection
Upon motion of a defendant made at any time after the filing of the indictment or accusation, the court shall order the prosecutor to permit the defendant to inspect and copy or photograph designated books, tangible objects, papers or documents other than written statements or confessions made by the defendant obtained from or belonging to the defendant and may, if the interests of justice so require, order the prosecutor to permit the defendant to inspect and copy or photograph written statements or confessions made by the defendant and designated books, tangible objects, papers or documents obtained from others except written statements or confessions."

This proposed rule as presented to the bench and bar was unopposed at the Judicial Conference held on June 18, 1953, and will in all probability be promulgated as a part of the rules governing the courts of New Jersey effective September 9, 1953. In providing that "if the interests of justice so require" the court may permit the defendant to inspect, copy or photograph "designated books, tangible objects,

papers, or documents obtained from others except written statements or confessions," it is proposed that the defendant shall have no right under any circumstances to inspect written statements of others. This would mean that the defendant could not prevail in his application under Part I hereof to inspect the written statements of others which are in the possession of the prosecutor. And in further providing that "the court * * * may, if the interests of justice so require, order the prosecutor to permit the defendant to inspect and copy or photograph written statements or confessions made by the defendant," this proposed rule adheres to the principle set forth in *State v. Cicenia*, 6 *N. J.* 296, *supra*.

To grant a defendant the unqualified right to inspect his confession before trial would be to give him an opportunity to procure false testimony and to commit perjury at the expense of society. It must be remembered that his confession would be admitted in evidence only after all the necessary safeguards have been taken as heretofore set forth. Moreover, he better than any one else knows its contents. Nor can we ignore the fact that it has been customary with our trial judges to allow defense counsel ample time at the trial to examine any confession offered in evidence but not, of course, enough time to enable the defendant to rig an alibi or a sham defense. There is, of course, no way of statistically determining which rule would effect the better justice because if one course is pursued one can never know what would have been the effect of the other course had it been pursued, but we do know the result from experience when for one reason or another a new trial has to be granted in a criminal case. Each successive trial improves the defendant's evidence. There may be cases where the interests of justice require that the trial judge in his sound discretion permit an inspection of the confession prior to trial. Each case necessarily stands on its own facts. But the burden rests on the defendant to show that in the interest of justice such an inspection should be allowed. Our law in this regard as set forth in the *Cicenia* case and elaborated here gives

ample protection to the accused and in fact is more liberal on his behalf than that of many jurisdictions.

The part of the order permitting the defendant to inspect his confession is reversed and the part of the order denying inspection of other papers in the county prosecutor's possession is affirmed.

WILLIAM J. BRENNAN, JR., J. (dissenting). That old hobgoblin perjury, invariably raised with every suggested change in procedure to make easier the discovery of the truth, is again disinterred from the grave where I had thought it was forever buried under the overwhelming weight of the complete rebuttal supplied by our experience in civil causes where liberal discovery has been allowed. The majority opines:

"In criminal proceedings long experience has taught the courts that often discovery will lead not to honest fact-finding, but on the contrary to perjury and the suppression of evidence. Thus the criminal who is aware of the whole case against him will often procure perjured testimony in order to set up a false defense."

That is startlingly reminiscent of Sir John Wigram's comment of over 100 years ago when the struggle to introduce discovery in Chancery was so bitterly waged:

"Experience, however, has shown—or (at least) courts of justice in this country act upon the principle—that the possible mischiefs of surprise at the trial are more than counter-balanced by the danger of perjury, which must inevitably be incurred when either party is permitted, before trial, to know the precise evidence against which he has to contend." *Wigram on Discovery* (1842), *sec.* 347.

And, just as the alleged "experience" was non-existent in Wigram's day ["English courts never had any experience at all in the matter," *Sunderland,* 42 *Yale L. J.* 863], we have had none in New Jersey, "long" or short, for, until *Rule* 2:5–8(c) was adopted five years ago and this court decided *State v. Cicenia,* 6 *N. J.* 296, two years ago, we followed the common-law rule which denied the accused any discovery

whatever of the State's case against him. Obviously, then, the fact that crime has increased in New Jersey in greater degree than in the nation as a whole is in nowise attributable to the operation of any discovery procedures. The State frankly told us on the oral argument here that the only time prosecutors willingly exhibit the accused's confession to his counsel is when there is a chance that counsel will persuade his client to enter a plea and save the State the expense of a trial. Apart from the question whether that limitation is wholly consistent with the prosecutor's function not primarily to convict but to see that justice is done, *cf. State v. Bogen*, 13 *N. J.* 137 (1953), *State v. Vaszorich*, 13 *N. J.* 99 (1953), this grudging practice plainly supplies no evidence of the asserted "long experience."

This anachronistic apprehension that liberal discovery if extended to criminal causes will "inevitably" bring the serious and sinister dangers of perjury in its wake will seem strange to many when coming from this court which has been generally commended for its aggressive sponsorship of liberal discovery and effective pretrial procedures in civil causes and can point to the solid evidence. of its beneficial results to the cause of justice without that defeat of justice through perjury foretold by the prophets of doom. It will be difficult to understand why, without proof but only from some visceral augury, we now assume that the hazard is so much greater in criminal causes, and, if it is, why in any event "The true safeguard against perjury is not to refuse to permit any inquiry at all, for that will eliminate the true as well as the false, but the inquiry should be so conducted as to separate and distinguish the one from the other where both are present." *Sunderland, supra*. Certainly without actual evidence and upon conjecture merely, and in the face of the contrary proof of our experience in civil causes, we ought not in criminal causes, where even life itself may be at stake, forswear in the absence of clearly established danger a tool so useful in guarding against the chance that a trial will be a lottery or mere game of wits and the result at the mercy of the mischiefs of surprise. We must remember that

society's interest is equally that the innocent shall not suffer and not alone that the guilty shall not escape. Discovery, basically a tool for truth, is the most effective device yet devised for the reduction of the aspect of the adversary element to a minimum. See Note, 64 *Harv. L. R.* 1011 (1952).

The majority discounts to the point of virtual rejection the evidence of the complete lack of the conjured danger in the results in England and Canada under a form of discovery advantaging the accused far beyond anything embraced within what is sought in this case. In England and Canada ordinarily the accused, before indictment or trial, is given a preliminary hearing before a magistrate who is obliged to examine every witness that can be brought before him by the Crown, with the result that all the evidence in the possession of the Crown is in the possession of defense counsel and he knows all that the Crown knows before the trial begins, see *State v. Dorsey*, 22 *So.* 273 (*La. Sup. Ct.* 1945). Those nations report no such consequences as the majority apprehends. The majority suggests that there is a difference based on the private prosecution technique between the criminal law of England and that of the United States. The relevancy of the difference escapes me. The State on the oral argument suggested another ground of difference, namely, that we are a less law-abiding people than the British. If we assume that this is so, how explain the like experience of our neighbor Canada between whose mores and our own similarities are so often remarked? See *R. v. Bohozuk*, 87 *Can. C. C.* 125; *Eng. and Emp. Dig. Supp.* 1952, *Crim. Law & Proc., p.* 24; 9 *Halsbury's Laws of England* (2d ed.) 164, *Crim. Law & Proc. sec.* 233.

The rule pronounced by *State v. Cicenia* stops far short of this English and Canadian practice. That decision rejected the notion that discovery in any aspect, including the inspection of his own confession, was the absolute right of the accused and limited the scope of discovery to such as the trial judge in the exercise of sound discretion would allow. Upon the trial judge is placed the responsibility for the balancing of the respective interests of the State and the

accused and the allowance or disallowance of the discovery sought as the best interests of justice may require.

But by our decision in this case we have made virtually sterile the principle of *State v. Cicenia*. I cannot conceive of any case in which an order allowing the inspection of a confession, for example, will be sustained if we can say, as we do, that in the circumstances of this case Judge Speakman committed error in allowing an inspection.

The charge is murder in the first degree, allegedly committed on August 22, 1952. In the early morning hours from 12:20 A. M. to 5 A. M. of August 24, in custody and without counsel and surrounded only by police officers, the accused had "conversations" with Detective Lieutenant Neidorf during which not the accused but the lieutenant wrote down 14 pages of "narrative" which when completed the accused read aloud, had it read back to him by one of the officers, and signed.

It was not until over two months later that defendant, being without means to employ counsel, was assigned counsel in his defense. Assigned counsel have been members of the bar of this State for 37 years and 20 years respectively, and are practitioners of acknowledged standing, ability and integrity. The accused told them that he had signed a statement but that "he could tell us nothing about the contents of any statement that he may have signed." Counsel sought out the prosecutor, who acknowledged that he had such a "signed confession" but refused to permit counsel to examine either it or the statements of other persons also in his possession. He also refused to disclose the names of such other persons.

Such investigation as counsel were able to make satisfied them, however, that there were "material discrepancies between the facts as we have been able to ascertain them and the theory of the homicide indicated by the State, and to ascertain the real truth of the matter and to prevent an injustice from being done," they sought from Judge Speakman and were granted the order directing that they be allowed "to inspect and make a copy of" the alleged con-

fession, but their application for inspection of the statements of other persons, or, in the alternative, that they be supplied with the names of such other persons, was denied.

Judge Speakman did not enter the order without careful consideration of the possibility of harm to the public interest in the circumstances of the case. He considered whether "the prosecutor will be hampered in his preparation for the trial," whether it in anywise appeared that "the defendant is in any way connected with any organized ring or criminal gang" (this so as to satisfy himself whether there was the possibility of "tampering with any witnesses"), noted that in the two months before the accused was assigned counsel "the prosecutor could have made and undoubtedly did make, a full investigation of the case without any interference by, or impediment from any person or source," and concluded that there was nothing to indicate that there might result "a failure of justice, or that the public interest will be adversely affected, if the inspection of defendant's confession is permitted." He denied the application for leave to inspect the statements of other persons or to be supplied with their names, apparently because he viewed these as in the category of the "work product" of the prosecutor and invulnerable to disclosure in the absence of a showing of the "most compelling of reasons." *Cf. Rule* 3:16–2, applicable in civil causes, which provides that "The deponent shall not be required to produce or submit for inspection any writing obtained or prepared by the adverse party, his attorney * * * in anticipation of litigation and in preparation for trial unless the court otherwise orders on the ground that a denial of production or inspection will result in an injustice or undue hardship." See *Hickman v. Taylor,* 329 *U. S.* 495, 91 *L. Ed.* 451 (1947).

It shocks my sense of justice that in these circumstances counsel for an accused facing a possible death sentence should be denied inspection of his confession which, were this a civil case, could not be denied. *Cf.* Note, 64 *Harv. L. R.* 1011 (1951). If we should not overlook the fact that constitutional and statutory guaranties for the protection of the

232

criminal accused deny the State a corresponding breadth of discovery, so that it is reasonable not ordinarily to allow the accused access to the prosecutor's "work product" in the form of the statements of others, that reason cannot be applied to the accused's own confession. This accused's confession, as indeed is true virtually of all confessions, was the product of *ex parte* discovery in a form which would never be tolerated in a civil cause. The accused was without counsel, denied even the comfort of the presence of a friendly face, in "conversations" in the small hours of the morning with a sizeable group of police officers, the document not even of his composition but the "narrative" put down and composed by Lieutenant Neidorf. Under such circumstances the State could and did, at its leisure and without hindrance or interruption, since none was there in the interest of the accused, persist until there was drained from him everything necessary to support the charge against him, and that the State prizes the result for that reason is manifest from the tenacity with which defense counsels' effort to see it is resisted.

In the ordinary affairs of life we would be startled at the suggestion that we should not be entitled as a matter of course to a copy of something we signed. Granted that there is a public interest present in the case of the confession of one accused of crime which makes generally inapplicable this rule of everyday affairs, how possibly can we say that counsel for the accused should be denied a copy in face of the affirmative findings by Judge Speakman, certainly supported by what was before him, that neither the public interest nor the prosecution of the State's case will suffer? Surely we have come a long way since the day when Mr. Justice Cardozo was able to discern only "The beginnings or at least the glimmerings" of a "power in courts of criminal jurisdiction to compel the discovery of documents in furtherance of justice." *People v. Supreme Court*, 245 N. Y. 24, 156 N. E. 84, 86 (*Ct. App.* 1927).

It is said that the accused "better than anyone else knows its contents" and that his representation to his counsel that

he does not is "unbelievable." Even if that is our belief, why are we to say that Judge Speakman's contrary conclusion was not reasonably founded? I should think it was entirely reasonable for Judge Speakman not to disbelieve that assertion in face of the circumstances under which the confession was taken, the "conversations" over five hours of the early morning and the fact that it is not the accused's composition but the "narrative" written down by the police officer.

The majority goes further, however, and holds that in any event "the fact that he may not recall the contents of the confession does not entitle him to an inspection of the same." But this was not treated by Judge Speakman as a reason standing alone for allowing the inspection. It was the dilemma in which defense counsel were placed because of their client's representation to them that this was the case that persuaded the judge that an inspection was necessary and might properly be allowed in the absence of a showing of any threat to the proper prosecution of the indictment or otherwise to the public interest.

Every member of this court agrees that the counsel assigned in this case would not for a moment knowingly permit the accused to make any improper use of his confession. In the circumstances the dilemma in which counsel find themselves ought alone be enough to support Judge Speakman's order. It is most unfair and we have no right to thrust upon assigned counsel the arduous and trying task, fraught with emotional strain as it always is, of the defense of an accused whose life is at stake, and then hogtie them so as to threaten the effectiveness of their service.

And there are no answers in the suggestions that the confession will not go into evidence until after the State has satisfied the trial judge of its voluntary character, and, if admitted, that counsel will have "ample time at the trial to examine any confession offered in evidence, but not of course enough time to enable the defendant to rig up an alibi." Those suggestions strike me as missing completely the point made by counsel in their application to Judge

Speakman. Their primary concern was not with the voluntary or involuntary character of the confession but with the more vital issue of its credibility if it is admitted in evidence. Their investigation so far as it has gone raises doubt in their minds as to the truth of some of the things which apparently are stated in the confession. Lieutenant Neidorf's affidavit does say that there are in the confession "names of persons as well as various times, places and events which are peculiarly within his knowledge and unknown to the investigating officers prior to the discovery by defendant himself." What counsel sought was the opportunity to do what the State did when the trail was fresh, namely, seek corroboration or lack of it from external facts through avenues of inquiry opened by the confession. By pitching part of its argument upon the voluntariness of the confession, the majority ignores the true significance of the purpose of counsels' application, that is, to be in a position at the trial to meet the issues of the confession's credibility or the completeness of the tale it tells. The implication in the majority's argument is that the accused is guilty so that not only is he not to be heard to complain of the use of the confession by the police as evidence to prove that fact and as a source of leads to make the case against him as ironclad as possible, but also that he has no complaint that his counsel are denied its use to aid them better to develop the whole truth. In other words, the State may eat its cake and have it too. To that degree the majority view sets aside the presumption of innocence and is blind to the superlatively important public interest in the acquittal of the innocent. To shackle counsel so that they cannot effectively seek out the truth and afford the accused the representation which is not his privilege but his absolute right seriously imperils our bedrock presumption of innocence. And the assertion that counsel will be allowed "ample time" at the trial to examine the confession is disingenuous to a fault. "Ample time" is no more than time to read the writing, perhaps a half-hour or an hour or two at best, hardly enough even for counsel to organize a proper cross-examination, let alone initiate and

complete an investigation to satisfy themselves upon the vital question which is the essence of the inquiry, namely, the credibility of what appears in the confession.

The holding of this case gives the majority's protestation that "In this State our courts are always mindful of the rights of the accused" a hollow ring. The assurance seems doubly hollow in light of the emphasis upon formalism in this case while it has been our boast in all other causes that we have subordinated the procedural niceties to decisions on the merits.

To me this decision is a regrettable retreat from the advanced position we won in the *Cicenia* case. I would affirm Judge Speakman's order in its entirety.

HEHER and JACOBS, JJ., join in this dissent.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD and BURLING—4.

*For affirmance*—Justices HEHER, JACOBS and BRENNAN—3.