{¶ 74} On this appeal following a jury trial before Judge Nancy Margaret Russo, I concur only with respect to the seventh assignment of error challenging the sufficiency of the evidence, and dissent from all others. I would reverse the judgment and remand for a new trial because the State engaged in numerous and repeated discovery violations, withheld exculpatory evidence, and employed a jailhouse informant who claimed Ayers made an eleventh-hour confession, despite his vague and inconsistent testimony. I would sustain assignments one, two, three, five, six, and eight, and would find assignments four, nine, ten, and eleven moot.
{¶ 75} Because the majority's statement of the facts is both incomplete and inaccurate, I will append and correct where necessary and start with a background of the proceedings. Dorothy Brown's body was discovered in her apartment at approximately 2:45 p.m. on December 17, 1999. The coroner, who conducted the autopsy report the following day, was unable to specify a time of death beyond that already provided by witnesses who had last seen her at about 2:00 a.m. on December 17th. Ayers was arrested on March 14, 2000, indicted for murder on March 27, 2000 and, unable to post bail, was in jail until his trial.
{¶ 76} Ayers twice waived his speedy trial rights to accommodate discovery delays and the prosecutor's untimely disclosures of evidence, but moved to suppress additional evidence revealed on the eve of trial. Although the judge denied the motion, she ordered the State to produce police investigatory records for an in camera review, and provided Ayers an opportunity to view some of those records prior to trial.
{¶ 77} After the jury was impaneled the State then disclosed its intention to call a new witness, a jailhouse informant named Donald Hutchinson, to whom Ayers had purportedly admitted the killing. The judge denied the motion to suppress Hutchinson's testimony, trial was held, and the jury, after being instructed to work through a deadlock, found Ayers guilty of aggravated murder, aggravated robbery, and aggravated burglary.
 Failure to Provide Timely Discovery
{¶ 78} Ayer third assignment of error addresses the failure to supprs'ess detective Kovach's testimony about statements that were not disclosed until the eve of trial. A judge has discretion to allow evidence in spite of a discovery violation only if the record does not show that the violation was willful, that prior knowledge would have benefitted the defendant, or that he was unfairly prejudiced by the violation.[1] Although I believe that Ayers prevails on each of these three principles, I will focus primarily on whether the proceedings disclose a willful discovery violation.
{¶ 79} On April 11, 2000, Ayers moved for discovery under Crim.R. 16 and, after he executed a limited waiver of his statutory speedy trial rights, trial was set for September 12, 2000. On July 14, 2000, he filed supplemental motions requesting discovery of Cuyahoga Metropolitan Housing Authority (CMHA) security videotapes the State had not turned over, and made specific motions requesting that law enforcement officials be ordered to disclose their investigations to prosecutors, and that the prosecution be ordered to submit its file for an in camera inspection for exculpatory information. At a pretrial on August 9, 2000, Ayers recorded his concerns about the State's compliance with discovery because he still had not received the videotapes, and expressed a desire to be sure that all other information had been disclosed. Among things specifically discussed was his request for any trace evidence, and the prosecution's assurance that none existed. The following took place:
 {¶ 80} "[Ayers' attorney]: * * * So I just want to make that clear for the record so we don't find out sometime around the third day of trial that a hair was found somewhere or something else. We've been told nothing was found, nothing was even looked for. Nothing matches up to our client or anybody else.
 {¶ 81} "THE COURT: Is that your understanding, Mr. Mahoney?
 {¶ 82} "MR. MAHONEY [Assistant Prosecutor]: After talking with Detectives Kovach and Cipo, that is my understanding, Judge."
{¶ 83} Ayers made a similar argument in support of his motion concerning law enforcement information, stating:
 {¶ 84} "[Ayers' Attorney]: Your Honor, that's basically, again, tell them to give Mr. Mahoney everything that he has so we're not — I know you've probably seen it, I've seen it, where it's the third day of trial and one officer comes in and says, `By the way, in the squad car he told me he did it.' And the prosecutor says, `Jeez, I just found that out.'
 {¶ 85} "* * * [W]e want them ordered to give all that stuff to Mr. Mahoney now so we have it, any information or any evidence he intends to introduce, so we have ample time to prepare."
{¶ 86} The prosecutor responded that he believed he had all information from the police investigation, and that an order directing the police to turn over information was unnecessary. He added:
 {¶ 87} "What I'm indicating is that I'm aware of the rules of discovery, I'm aware of the Brady requirement, I'm aware of the Supreme Court announcement. I've given them everything they asked for, save the videotape, which is being processed, hopefully, as we speak. * * *
 {¶ 88} "And I've contacted the law enforcement officers involved; they assured me they've given me everything."
{¶ 89} Eight days later, on August 17, 2000, the State moved for an order compelling Ayers to submit hair samples, which was granted the next day. The samples were sought because pubic hairs had been collected from Dorothy Brown's mouth and dentures and an expert report, available since March 2000, showed none were hers. The prosecutor eventually revealed that none of the hairs matched Ayers. On September 5, 2000, a week before the scheduled trial date, the prosecutor stated that he was unable to provide the defense with the CMHA security videotape because of difficulties in viewing it. The single tape was made through use of a device called a multiplexer and panned through six camera angles at high speed which required frame-by-frame analysis, and also had unreadable date and time markers. The prosecution and the police had earlier stated that Ayers, contrary to his assertions about his actions, did not appear on the videotape, and police reports revealed that the detectives focused their search on him because of his supposed lies. While interrogating him, the detectives repeatedly accused him of lying about the contents of the videotapes and Detective Cipo even stated, in an affidavit supporting a search warrant for Ayers' home, that he "reviewed the video tape and Ayers does not appear at the time stated or thereafter." In fact, the police had attempted to use a conventional videotape player to view the multiplexed tape, which was inadequate to allow meaningful review, and at trial Detective Cipo admitted that he had never actually viewed the tape prior to signing the search warrant. Although the tape had been in police possession since the date of the crime, no one had attempted to make it viewable.[2]
{¶ 90} CMHA police eventually obtained the multiplexer from the apartment complex and delivered it to an expert from NASA, who used the device to separate the camera angles and prepare the tape for conventional viewing. The prosecutor informed the judge that the NASA representative would decode the date and time marker, and that the tape would be ready in a week or ten days but not before the scheduled trial date.
{¶ 91} At the same hearing, the prosecutor supplemented his witness list to include CMHA police detective Raymond Morgan and other CMHA officers, stating:
 {¶ 92} "* * * In regards to adding other witnesses I just mentioned the name of the CMHA officer. Throughout the course of our discussions defense counsel has been aware that CMHA officers were involved and I would add several witnesses from the Cuyahoga Metropolitan Housing Authority; that being Detective Morgan, Lieutenant Imes and there may be one other witness from CMHA security that I would add."
{¶ 93} Moreover, while Ayers had been ordered to submit hair samples on August 18, 2000, the prosecution apparently had not given him any further information concerning this order as trial approached, as his lawyer also referred to "a scientific test that is still ongoing that we still have not received." In light of this undisclosed information, and after learning that the videotape was not ready, as well as the other disclosures, Ayers agreed to extend his speedy trial waiver and continue the September 12, 2000 trial date to November 20, 2000.
{¶ 94} The videotapes did not become available until late October 2000, and required persistent efforts on Ayers' part to complete their disclosure.[3] The tapes corroborated Ayers' account that he and Sarah Harris went to assist Brown in the early morning hours of December 17, 1999, and disproved the statements of police and prosecutors that he did not appear on the tapes.
{¶ 95} More discovery issues arose at a hearing on November 8, 2000, and Ayers renewed his request that the judge order the State to turn over all police investigation material directly to defense counsel or for in camera review. Ayers cited the State's belated discovery of hairs in the victim's mouth, its failure to timely decode and view the security videotape, and its most recent revelation, made that day, that CMHA police Sergeant Christopher Jakub had reported a statement made by Ayers on March 14, 2000, the date of his arrest. According to the State, Jakub would testify that he spoke with Ayers during a break in his interrogation by Cleveland police, that Ayers told him his interrogators wanted him to admit hitting Brown, and asked if he would be allowed to go home if he made that admission. Sergeant Jakub had made a written report of the incident, which was faxed to Detective Kovach on March 30, 2000.
{¶ 96} In defense of his untimely disclosure of Jakub's statement, the prosecutor explained:
 {¶ 97} "Your Honor, I have had the opportunity to talk with the Cleveland police officers and detectives involved in this case. I believe that I have everything that is in their file.
 {¶ 98} "This was a homicide that occurred at a CMHA property, and CMHA people, police, initiated certain aspects of their own investigation. That information had not previously been forwarded to me. I now believe that I have the information pertinent in this case in connection with the [CMHA's] investigation."
{¶ 99} Despite the prosecutor's assurances, new evidence was again revealed on November 20, 2000, the morning trial was to begin, during a pretrial suppression hearing concerning Jakub's testimony. The prosecutor called Detective Kovach to testify concerning her interrogation of Ayers on March 14, 2000, apparently for the sole purpose of establishing that he waived his Miranda rights[4] after properly being informed of them. In addition, the prosecutor and Kovach had the following interaction:
 {¶ 100} "Q [by Mr. Mahoney]: Now a couple of days after your interview on the 14th, on March 16th did you have another opportunity to speak with Mr. Ayers?
{¶ 101} "A [by Kovach]: Yes, we did.
 {¶ 102} "Q: Okay. Well, before I get to the 16th maybe I should finish the 14th chronologically.
 {¶ 103} "After the 14th as you are leading Mr. Ayers to the city jail — was he booked on the 14th?
{¶ 104} "A: Yes.
 {¶ 105} "Q: Okay. As you're leading him to the jail what, if anything, is being said?
 {¶ 106} "A: When we got over to the jail you know we were advising him that he was being placed under arrest.
{¶ 107} "Q: In connection with what crime?
 {¶ 108} "A: With the death of Dorothy Brown. And at that time he said to Detective Cipo and me, he said, if I tell you I beat her can I go home."
{¶ 109} In later questioning the prosecutor elicited Kovach's admission that she did not make a written report of Ayers' purported statement. Ayers objected to the testimony that Kovach was now claiming he made this statement to her, because it had come to light for the first time that morning. The prosecutor indicated that he was surprised by Kovach's testimony as well and, in defense of his lack of knowledge, immediately pointed to her admission that she did not make a written report. Ayers pointed out that the form of the prosecutor's questions showed that he was aware of Kovach's testimony prior to the hearing. He asked that any purported statements by Ayers to Detectives Kovach or Cipo be suppressed because of the willful violation of discovery.
{¶ 110} The judge hesitated to hold the prosecutor responsible for evidence withheld by the two detectives and stated that "it's been apparent throughout this entire case that these two detectives have been less than forthright with the prosecution about what they have." The judge did, however, review the police reports in camera, and requested a complete copy of the police reports be made for inclusion in the record.[5]
{¶ 111} When the suppression hearing resumed, Detective Cipo also testified that Ayers made the statement about which Kovach had testified and both he and Kovach also stated that they had informed the prosecutor of the statement prior to the suppression hearing, and even indicated that they informed the prosecutor prior to any preparation for that hearing.
{¶ 112} In arguing against suppression of the detectives' testimony, the prosecutor no longer denied prior knowledge, but demurely stated that he was not a witness at the hearing, that his denial of prior knowledge would not be evidence, and thus the judge would have to decide the motion without his confirmation or denial. The prosecutor also contended that there had been no discovery violation because the defense was aware of Jakub's testimony even if unaware of that of Kovach and Cipo, and that the proper remedy for any discovery violation would be a continuance and not exclusion of the evidence.
{¶ 113} The judge denied the motion to suppress, finding that Detectives Cipo and Kovach had independently withheld information, and that their failure to cooperate with the prosecutor could not be held against the State as a discovery violation. The judge stated:
 {¶ 114} "* * * And I agree with Mr. Mahoney that he did not testify and quite frankly to ask me to rely on the statements of the police officers * * * is asking too much of this court. That's also the only evidence before me. I don't think that's sufficient evidence to hold it against the state as a discovery violation."
{¶ 115} The proceedings, however, show willful misconduct from any vantage point. Ayers correctly pointed out that the prosecutor's questioning deliberately elicited Kovach's revelation, betraying his prior knowledge that she would so testify, and belying his supposed surprise at hearing it and his expression of outrage at being accused of complicity. The nature of his questioning speaks for itself; unless the prosecutor is clairvoyant, he was well aware of Kovach's testimony before she gave it.
{¶ 116} An attorney is an officer of the court and is always under oath when speaking to matters within his personal knowledge, such as the conduct of proceedings.[6] When confronted with testimony that he had been informed of Ayers' alleged admission, an issue concerning the conduct of the proceedings, the judge should not have allowed the prosecutor's coy attempt to avoid denying knowledge by claiming he was not a witness and his statement could not be evidence. On the issue of compliance with discovery rules, the prosecutor was a witness with a duty to share the truth. Not only did he have a duty to address his conduct of discovery as an officer of the court, as part of his duty to disclose exculpatory evidence under Brady v. Maryland[7] he was also required to disclose his knowledge of perjured testimony. Therefore, if he intended to deny Cipo's and Kovach's claims that they had informed him of their testimony well in advance of its disclosure to Ayers, he was obligated to inform Ayers of the detectives' dishonesty.[8] The prosecutor's failure to address the issue should not have been excused, and his failure to deny the testimony should have been viewed as an admission that it was true. His failure to address the issue and his precocious questioning of Detective Kovach can only lead to the conclusion that he willfully withheld the statements in violation of Crim.R. 16(B).[9]
{¶ 117} Even accepting the judge's inexplicable finding that the evidence was withheld by the detectives rather than the prosecutor, I cannot agree with the conclusion that the prosecutor should not be punished for the detectives' conduct. Such a finding invites repetition of the conduct seen here instead of preventing it because it makes no one accountable for evidence withheld by police. If prosecutors know they are responsible for such misconduct they will be compelled to impress that fact upon law enforcement officials and motivate them to comply with discovery rules.
{¶ 118} If all police investigation and activity is considered not independent, but a confidential part of the prosecutor's work product, not discoverable or discoverable subject only to the defendant's agreement to provide reciprocal discovery,[10] then the prosecutor is obliged to accept all actions of the police as his own, and cannot selectively refer to discovery abuses or withheld evidence as unintentional or the product of independent, "uncooperative" agents. Certainly a defendant could not prevail on the theory that a co-conspirator's damning testimony or conduct should be disregarded, and the same approach should apply here. Either the police are the prosecutor's agents, or they are not.[11]
While a willful discovery violation itself requires suppression, I also disagree with the majority's finding that Ayers was not prejudiced by Kovach's testimony because he had already been informed that Sergeant Jakub would testify that he made a similar statement. The majority is mistaken in believing that it made no difference who testified to the statement, and it is noteworthy that the prosecutor called Kovach to testify at trial, not Jakub.
{¶ 119} Although Sergeant Jakub reported that Ayers had made a similar statement, his testimony was far more favorable and sympathetic to Ayers than that of Kovach. Jakub indicated, both in his written report and his pretrial testimony, that Ayers repeatedly and adamantly denied the charges, and that he made the statement in a final, exasperated attempt to end the police interrogation. Such testimony would have left a much different impression than that given by Detective Kovach, who testified that Ayers made the statement in a much more calculated, matter-of-fact manner.
{¶ 120} The majority further errs in finding that Ayers somehow admitted the lack of prejudice by failing to seek a continuance. The prejudice resulted from the fact that Kovach testified to the statement instead of Jakub, and such harm could not have been ameliorated by a continuance. Moreover, Ayers' previous agreements to continue the trial invariably led to the untimely production of further evidence against him. This pattern, as much as anything, was a sufficient basis to refuse a continuance and seek suppression based on repeated failures to disclose. Not only is one rightly skeptical of the reliability of testimony that surfaces at such a late date, Ayers reasonably refused a continuance in order to avoid even further untimely disclosures of evidence against him.
{¶ 121} The prosecutor had repeatedly stated that all required disclosures had been made, only to repeatedly contradict those assurances by disclosing new evidence. While this behavior could, in some cases, be written off as simple bumbling, it takes on a more suspicious character when combined with the curious lack of familiarity with videotape equipment for security cameras,[12] the untimely presentation of Sergeant Jakub's statement despite the prosecutor's assurance that he was well aware of CMHA's involvement, and the sudden and propitious presentation of Kovach and Cipo as witnesses to Ayers' admission. I would sustain the third assignment of error.
 The Failure to Disclose Exculpatory Evidence.
{¶ 122} Ayers' first and second assignments of error concern the State's failure to disclose exculpatory evidence as required by Brady v. United States, supra. The disclosure of exculpatory evidence is constitutionally required, and the prosecutor must disclose any evidence favorable to the defendant and "material either to guilt or to punishment[.]"[13] The majority has misstated the materiality definition by omitting the concept of "reasonable probability," thereby substantially heightening the constitutional standard as stated by the United States Supreme Court. Evidence is "material" if there is areasonable probability that its disclosure would have altered the outcome of the proceeding, and a probability is "reasonable" when "sufficient to undermine confidence in the outcome."[14] The materiality determination must be made in light of the entire record, meaning that "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."[15]
Not only was the evidence withheld by the prosecutor substantial, the weak case against Ayers heightens its importance.
{¶ 123} The judge ordered the prosecutor to turn over the police reports[16] for inclusion as a sealed exhibit and conducted an in camera review. The judge apparently disclosed some, but not all, of the contents of these reports to Ayers during the suppression hearing on November 20, 2000. Although the parties discussed the contents of at least thirteen documents on the record, it is difficult to ascertain whether the judge allowed Ayers to see other documents or whether he was allowed to see those mentioned in their entirety, as many contain multiple pages. Moreover, it is unclear how much time Ayers was given to review the documents before the hearing, although it does not appear to have been more than a few hours.
{¶ 124} The information in the police file included reports about Darrin Ward and Jeritt Ward,[17] who appeared to be brothers, and both of whom appeared to have some involvement in the investigation. The prosecutor withheld information that Darrin Ward had a previous arrest for a sex offense[18] and was initially considered a primary suspect because Dorothy Brown's body was discovered partially undressed. The police also failed to disclose that another resident of the apartment building complained that he had attempted to break into her apartment by climbing through her balcony door, or that the initial police report noted the possibility of entry through the balcony and that Dorothy Brown's balcony door was found closed but unlocked.
{¶ 125} Carol Brown, a resident of the apartment complex, told police that Ruth Ward, another resident, was often away from her apartment but that she had two sons who stayed there. She identified one of the sons as Darrin Ward, and stated that he had attempted to break into her apartment by climbing through her window a few days before Dorothy Brown's murder. She also stated that he had been seen knocking on several apartment doors in the building, and specifically identified a fifth floor resident who had complained about Ward's attempts at entry. When questioned, Ward admitted knocking on doors on at least one occasion, claiming that he had lost the key to his mother's apartment and was asking residents if he could use their phone to call for help.
{¶ 126} The prosecutor argued that police did not follow up on Carol Brown's statement because of reports that she drank to excess, and also stated that her story was inconsistent and/or uncorroborated by other witnesses. The police reports, however, show that the only uncorroborated part of her statement was her claim that Darrin Ward had attempted to break into her apartment through the window, and the initial police report indicates that such entry was entirely possible because of the connecting balconies. Ruth Ward and other residents verified that two of her sons had stayed at the apartment and Darrin Ward admitted going door-to-door in the apartment complex.
{¶ 127} Moreover, the police failed to follow up on a March 25, 2000 report about Jeritt Ward that revealed he was being held in jail on federal charges and wanted to talk to police about Dorothy Brown's murder, and the prosecutor withheld the information. The prosecutor argued that the information concerning Jeritt Ward did not require disclosure because police never questioned him and, thus, no exculpatory evidence was discovered.[19]
{¶ 128} Although a report available in March of 2000 confirmed that pubic hairs were found in Brown's mouth and on her dentures,[20]
the police did not follow up on this evidence because by that time they had abandoned the Wards as suspects. While the majority opinion proclaims that there was no evidence of sexual assault, this is not true; the majority relies only on the fact that no seminal fluid was found, but ignores the fact that Brown's body was found nude from the waist down and that pubic hairs were found on her dentures and in her mouth. The majority claims that the pubic hairs were simply part of the detritus of Brown's apartment, but fails to address the fact that the hairs found were similar to each other, but did not match either Brown or Ayers.
{¶ 129} The police reports also reveal information concerning the detectives' questioning of Kenneth Smith. At trial, detective Kovach testified that she and Detective Cipo had questioned Smith in February 2000, and again on March 16 and 17, 2000. Smith then signed a written statement, dated March 17, 2000, which stated, inter alia:
 {¶ 130} "On Dec. 17, 1999 about 12 10 PM I got a call from David. I wasn't able to talk at that time because I think I was on the phone with another call. I told him I would call him later but he called me back. It was about 2 PM when he called. He said a resident just died and I asked how and he said he didn't know. I asked how again and he said someone must have went in there. * * *."
{¶ 131} The prosecution's theory focused on telephone records and Smith's statement as evidence that Ayers had spoken with Smith about his knowledge of Dorothy Brown's death prior to the discovery of her body. Contrary to the majority's suggestion, however, Smith's testimony was far from unequivocal,[21] and in fact he sought to recant the recollection claimed in the written statement. At trial the prosecutor led a reluctant Smith through the details of his statement, although it was apparent that he no longer intended to stand by it.[22] On cross-examination Smith admitted that he and Ayers spoke on the phone frequently and that he could not be sure whether the conversation he recalled occurred at the time noted on the log or some other time. The police obtained phone records for only a limited period, from 6:00 p.m. on December 16, 1999 until 3:00 p.m. on December 17, 1999, and a subsequent order to expand those records was ineffective because the records no longer existed. A phone company representative testified that the telephone logs are retained for only sixty days, so the narrow focus of the police investigation effectively cut off Ayers' ability to recover additional relevant information.
{¶ 132} Smith testified that detectives Cipo and Kovach pressured him into stating that Ayers told him about Dorothy Brown's death during the phone call recorded prior to the discovery of her body, and that they misled him into believing that the substance of the conversation was recorded and could be obtained from the telephone company. The detectives denied Smith's claims at trial, but the police reports are consistent with his story.[23] A report filed by Detective Kovach on February 9, 2000 shows that the detectives first visited Smith on February 8, 2000, and asked him about the telephone conversations at that time, and that Smith stated he could not remember the substance of the conversations. Nothing in that report indicates that the detectives believed Smith was withholding information about the conversations, but on March 16, 2000, Detective Cipo filed a report showing that the detectives called Smith to the station for questioning about the phone calls. This report omitted any discussion of the prior questioning, and suddenly indicated that Smith did remember the substance of the conversations.
{¶ 133} Interestingly, Detective Cipo's report mistakenly stated that the telephone records showed that Ayers called Smith on December 17, 1999, although the records actually show that both calls originated from Smith's number. Smith's written statement reflects the same error, indicating that Smith "remembered" the telephone calls in exactly the same mistaken fashion as Detective Cipo. As noted, in the written statement Smith goes so far as to recall that Ayers called him at "about" 12:10 p.m. that day, that he was on another call and told Ayers that he would return his call, but that Ayers called him back before he could do so.
{¶ 134} The police record discloses further information supporting Smith's testimony that he was pressured into the recollections of his written statement. Ayers was arrested on March 14, 2000, but was not immediately charged with murder. On March 16, 2000, Detective Kovach filed a notice, in compliance with department policy, explaining why Ayers was being held for over twenty-four hours without formal charges. In explanation, the notice stated:
 {¶ 135} "We will see the prosecutor tomorrow after an interview with one more key interviewee to charged [sic] this male with Agg. Murder."
{¶ 136} This report supports Smith's testimony that the detectives pressured him into making the written statement, because it shows the police believed his statement was critical to sustaining charges against Ayers. Moreover, the police had already committed themselves to Ayers' arrest prior to calling Smith for further questioning, despite the fact that he had already stated that he did not recall the substance of his December 17, 1999 telephone conversations with Ayers.
{¶ 137} The failure to disclose the circumstances surrounding Smith's written statement shows the weakness of the State's case against Ayers and the prejudice he suffered from the prosecutor's withholding of evidence. The facts that Smith first told the detectives on February 8, 2000, that he did not remember the content of the phone call, that they only returned to question him on this subject thirty-seven days later, when his testimony was deemed critical to sustaining the charges, and that Smith's written statement mirrors Detective Cipo's mistaken reading of the phone logs, all support Smith's assertion that he was coerced into misremembering the substance of a particular phone call that had occurred three months earlier and was one of many phone conversations he had with Ayers. Although Kovach and Cipo denied using any coercive or misleading tactics, Smith's prior lack of recollection would further harm their credibility — one must remember that Detective Cipo admitted to lying under oath when he submitted his affidavit in support of the warrant to search Ayers' apartment, and the judge essentially found that both detectives had lied in their testimony at the suppression hearing.
{¶ 138} I must again note that this raises the problem of the prosecutor's failure to deny the detectives' testimony at the suppression hearing. If the prosecutor knew the detectives were lying at the suppression hearing, he was obligated to present that evidence because it could be used to impeach their testimony at trial. Under Bagley, such evidence is unquestionably subject to the Brady requirement,[24] and its materiality cannot be questioned here — the detectives' credibility was in serious question and was highly relevant to the jury's assessment of all the facts, and Smith's testimony in particular.
{¶ 139} The evidence withheld by the prosecutor raises a number of issues that Ayers could have used in his defense, either by conducting his own investigation or by cross-examining police witnesses about the conduct of their investigation. Moreover, while the judge allowed Ayers access to some of the evidence prior to trial and allowed him to question witnesses concerning that evidence, the access and questioning allowed was inadequate to remedy the harm. The defendant's inability to prepare for trial should be assessed "in light of the totality of the circumstance" as part of the materiality determination.[25]
{¶ 140} Furthermore, once the evidence is deemed discoverable, Crim.R. 16(B) requires timely disclosure. Ayers is entitled to relief under this standard because, as noted in Scudder, supra, he can show that foreknowledge would have aided his case.[26] The timing of the disclosures prevented Ayers from investigating further or otherwise preparing the evidence before trial.
{¶ 141} I would sustain the first and second assignments of error, as well as finding error in the failure to disclose evidence not specifically raised in those assignments. Because the judge included the police file as a sealed exhibit and did not specify what evidence was or was not disclosed to Ayers, or whether he was granted an adequate opportunity to review that evidence, I consider those assignments to challenge the failure to disclose any exculpatory evidence contained within that file, regardless of whether specifically raised as error.
Testimony of Donald Hutchinson
{¶ 142} After the parties selected a jury and shortly before opening statements on the morning of Monday, November 27, 2000, the State revealed that a jailhouse informant, Donald Hutchinson, would testify that Ayers admitted to killing Dorothy Brown. Ayers was allowed to voir dire Hutchinson on Tuesday, November 28, 2000, and he testified before the jury on Monday, December 4, 2000. Although the details of Hutchinson's testimony are themselves extraordinary, it is also important to consider these circumstances within the context of the entire proceedings.
{¶ 143} Hutchinson's sudden appearance was not an isolated event, but was the last in a series of untimely and eleventh-hour revelations that raise serious questions about the fairness of the trial and the reliability of the verdict. Evidence of Ayers' supposed confession to Hutchinson comes from three sources; (1) the initial police report, filed on November 25, 2000, detailing Hutchinson's first statements to detectives Kovach and Cipo; (2) his voir dire testimony, given on November 28, 2000, which included testimony that Ayers had made further admissions since Hutchinson's November 25, 2000 meeting with the detectives; and (3) his trial testimony. From these three sources the substance of Hutchinson's story reveals that he met Ayers in the county jail while Ayers was conducting a Bible study group, and that Ayers first denied killing Brown and expressed confidence that he would be acquitted; however, at some point, within two or three weeks of trial, Ayers admitted the crime to Hutchinson who, after much soul-searching, determined that it was his moral duty to report the confession to the authorities. He then contacted detectives Kovach and Cipo on Saturday, November 25, 2000,[27] who interviewed him and made their report late that afternoon.
{¶ 144} The police report stated, inter alia:
 {¶ 145} "(1) that Ayers told Hutchinson he had seen Brown's money when he went to help her;
 {¶ 146} "(2) that Ayers returned to Brown's apartment between 3:00 a.m. and 3:30 a.m., but Brown woke up and discovered him;
 {¶ 147} "(3) that Ayers did not tell Hutchinson what weapon he used to kill Brown or how much money he had taken, and that Hutchinson had not asked;
 {¶ 148} "(4) that Ayers told Hutchinson he had a friend who was going to have to testify, and that Ayers had called him, but did not admit the murder to him; and
 {¶ 149} "(5) that Ayers had propositioned Hutchinson for sex."
{¶ 150} During his voir dire testimony on November 28, 2000, Hutchinson stated that, after his interview with detectives Kovach and Cipo, he elicited further admissions from Ayers on Saturday night, November 25, 2000, and that Ayers at that time gave him further details concerning the murder, including telling him that the murder weapon was a small black iron,[28] and that his robbery of Brown netted $700. Hutchinson stated that Ayers was willing to disclose the details to him on the premise that Hutchinson's uncle, a police officer, would testify on his behalf if he surrendered details about the murder weapon and the amount of money he took. Among his other statements in voir dire, Hutchinson testified:
 {¶ 151} "(1) that Ayers denied committing the murder until admitting it either "last week" (between November 20, 2000 and November 27, 2000) or "a week before he started going to court" (between November 13, 2000 and November 20, 2000);
 {¶ 152} "(2) that Ayers admitted the murder because Hutchinson was attempting to help him retain a new lawyer, and had told him that the new lawyer could not help him if he wasn't honest;
 {¶ 153} "3) that Ayers said he saw Brown's money and returned to her apartment to steal it, and that Hutchinson asked him how much he took, but did not get an answer;
 {¶ 154} "4) that Hutchinson unsuccessfully attempted to contact his lawyer over the Thanksgiving weekend to discuss Ayers' admissions, but eventually contacted detectives Cipo and Kovach directly;
 {¶ 155} "5) that Ayers continued to withhold any admission concerning the amount of money taken or the murder weapon until Saturday night, after Hutchinson's first conversation with the detectives;
 {¶ 156} "6) that Ayers gave Hutchinson detectives Cipo's and Kovach's names based on Hutchinson's story that his uncle was a police officer and could help him if he knew who was handling the case;
 {¶ 157} "7) that Hutchinson specifically went to Ayers on Saturday night, after speaking with the detectives, and made inquiries concerning details of the murder, and that Ayers then confessed details of the murder weapon and the amount of money taken."
{¶ 158} The prosecutor also questioned Hutchinson during voir dire, and led him through a series of statements that Hutchinson agreed to, as follows:
 {¶ 159} "Q. (by prosecutor) Did he tell you that there was a fight with the victim, the 76 year old woman, when she woke up and caught him stealing the money; what did he tell you?
 {¶ 160} "A. He told me that she woke up and he hit her a couple of times and, you know, that's when he —
 {¶ 161} "Q. You know, was he — he told you there was an altercation before that, that there was words exchanged, didn't he?
{¶ 162} "A. Yeah. Yeah. And then he —
 {¶ 163} "Q. Did he tell you that — he told you this, correct, the old woman was going to turn him in, right?
{¶ 164} "A. Yeah.
 {¶ 165} "Q. And he'd lose his job, did he tell you those things?
 {¶ 166} "A. Said he'll lose his job and, you know —
{¶ 167} "* * *
 {¶ 168} "Q. Now Mr. Ayers also told you that in regard to the evidence against him that the prosecution was going to call a friend of his, right?
{¶ 169} "A. Right. Uh-huh.
 {¶ 170} "Q. What did he tell you about the friend of his?
 {¶ 171} "A. He told me that the friend of his — he said the prosecution had called — he had called a friend of his and that they said that he told them that — told them that — weight [sic], hold — told them that he had called them — called him and said that it's a murder, you know, it was a lady found dead in our apartment, something like that.
 {¶ 172} "Q. Mr. Ayers told you that he had called a friend?
{¶ 173} "A. Yeah.
 {¶ 174} "Q. And that he told the friend about a lady being found dead in the apartment building?
{¶ 175} "A. Right.
 {¶ 176} "Q. But he didn't tell the friend or he didn't admit to the friend that he did the killing, correct?
{¶ 177} "A. Right. Right.
 {¶ 178} "Q. But he told you also that the state is going to call that friend as a witness and that the phone records would show that the call was placed one hour before the body was found?
{¶ 179} "A. Correct.
{¶ 180} "* * *
 {¶ 181} "Q. It's true, Mr. Hutchinson, David Ayers told you that a friend of his was going to come in and testify, correct?
{¶ 182} "A. Right.
 {¶ 183} "Q. And that friend would say that during the phone conversation the day the body was found David told him that the woman was found and someone must have went into the apartment, correct?
{¶ 184} "A. Correct.
 {¶ 185} "Q. Did — now did David Ayers proposition you for oral sex?
{¶ 186} "A. Yes, he did.
{¶ 187} "Q. When did that take place?
 {¶ 188} "A. That was — matter of fact that was last week."
{¶ 189} Many of these statements had not been disclosed in the November 25, 2000 report, and the prosecutor also led Hutchinson through an express denial that he and the prosecutor had met previously. I note this only because it appears that the previously uncooperative detectives had suddenly become much more cooperative with the prosecutor's investigation, and must have briefed him on the content of Hutchinson's expected testimony.[29] It is also interesting that Hutchinson stated that Ayers told him that his friend, Kenneth Smith, would testify that Ayers told him "someone must have went in the apartment," using a near-direct quote from Smith's written statement, a statement that in all likelihood Ayers had never seen. One must question the likelihood that Ayers would have confessed to Hutchinson using Smith's words.
{¶ 190} At trial, Hutchinson again testified to Ayers' admissions, and stated:
 {¶ 191} "(1) that Ayers stated that he admitted the murder to Smith during their telephone conversation;
 {¶ 192} "(2) that Ayers first admitted the murder to him in response to Hutchinson's quotation of a Bible verse concerning the need to confess one's sins;
 {¶ 193} "(3) that Ayers never mentioned seeing Brown's money when he went to her apartment to help her earlier in the evening;
 {¶ 194} "(4) that he invented the story about having an uncle who was a police detective in order to obtain further details of the murder on Saturday night, and not to obtain the investigating detectives' names.
 {¶ 195} "(5) that Ayers propositioned him for oral sex on Saturday night, after giving him the details of the murder weapon and amount of money taken."
{¶ 196} As this summary demonstrates, and as will be discussed further infra, Hutchinson's testimony is so lacking in credibility and reliable detail that it cannot be considered persuasive. However, I also agree that Ayers was entitled to suppress Hutchinson's testimony of any event occurring after his first meeting with the detectives as violative of his right to counsel, protected by the Sixth and Fourteenth Amendments to the United States Constitution.
{¶ 197} The constitutional right to counsel is violated when law enforcement officers employ a jailhouse informant to interrogate the defendant surreptitiously.[30] Although some cases turn on whether the informant actively sought information or acted as a mere "listening post,"[31] that is not the question here. Hutchinson admitted that he actively questioned Ayers to get more details after meeting with the detectives. The question here is whether Hutchinson was acting on his own initiative or as the agent of the government.
{¶ 198} The government cannot excuse itself from responsibility for misconduct by claiming that it did not expressly ask Hutchinson to seek further information or expressly encourage him to do so. Where the government "intentionally creates" or "knowingly exploits" a situation in which it "must have known" that the informant would take steps to obtain further information, it cannot claim a right to use the information based on its deliberate ignorance of the circumstances.[32] Because the defendant will ordinarily be unable to obtain direct evidence of the government's knowledge, the defendant proves the violation by showing that the government "must have known" the likely consequences of its conduct.[33]
{¶ 199} The evidence here shows that Hutchinson supposedly contacted the police detectives on Saturday, November 25, 2000, and told them that Ayers had admitted the murder. The detectives' report specifically mentions Hutchinson's failure to include details of the murder weapon and the amount of money taken. After speaking with the detectives, Hutchinson then claims to have inquired about and obtained admissions on these issues solely upon his own initiative, and without regard for the effect his assistance would have on the charges pending against him. He had, however, admittedly attempted to contact his lawyer prior to speaking with the detectives, and there was no question at trial that Hutchinson expected some reward for his assistance.[34] These circumstances are too well woven to be mere coincidence. Allowing the State to disclaim Hutchinson's agency vitiates the right to counsel by providing a gaping loophole to the doctrine stated in Moulton. The State should not be able to accomplish with a wink what it cannot do expressly. I would sustain the sixth assignment of error.
 The Weight of the Evidence
{¶ 200} When a jury verdict is challenged as against the manifest weight of the evidence, we review the record deferentially, yet broadly, to determine "whether the evidence produced attains the high degree of probative force and certainty required of a criminal conviction."[35]
Under the manifest-weight test:
 {¶ 201} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."[36]
{¶ 202} While there are few cases that satisfy this standard, the circumstances here fairly cry out for remand. Ayers' conviction stands critically upon a witness statement that was taken under suspicious circumstances and recanted by its maker, and upon a supposed eleventh-hour confession made to a jailhouse informant with a history of dishonesty and an inability to consistently relate even the few meager details of his testimony.
{¶ 203} As demonstrated above, Hutchinson's story did not maintain consistency. Although the police report and his voir dire testimony indicate that Ayers told him he returned to rob Brown because he saw money in her apartment, at trial he stated that Ayers never mentioned seeing her money. The police report indicates that he did not ask Ayers how much money he took, but in voir dire he stated that he did ask. He testified in voir dire that Ayers admitted the murder as part of an effort to retain a new attorney, but at trial he claimed that Ayers admitted the murder in response to a Bible quotation. While both the police report and the voir dire testimony state that Ayers denied telling Smith that he killed Brown, at trial Hutchinson stated that Ayers claimed he admitted the murder to Smith. While he testified in voir dire that he created the fictitious uncle in order to learn the names of the investigating detectives, at trial he claimed that he used the story only to learn further details of the murder. Furthermore, while he testified at trial that Ayers did not proposition him for oral sex until the evening of November 25, 2000, the proposition is included in the police report from an interview that afternoon.
{¶ 204} Contrary to the majority's statement that Hutchinson's testimony referred to facts that only the murderer would know, his story in fact draws heavily from police reports that were not available to Ayers. Just as Smith's written statement reflected Detective Cipo's mistaken view of the phone logs, Hutchinson also testified that Ayers admitted that he called Smith, despite the fact that the phone logs show the opposite. Hutchinson's reference to $700 is also curiously coincidental, as that figure has a life of its own within the police reports.[37] It is extremely odd that Ayers would admit taking this exact amount from Brown, just as it is odd that he would quote from Smith's written statement in his admission to Hutchinson, and odd that he would mistakenly claim that he called Smith on the day in question instead of Smith calling him.
{¶ 205} Not only was Hutchinson's testimony inconsistent in a number of particulars, a review of his testimony, both in voir dire and at trial, shows that his story is highly generalized and deliberately vague as to details and dates. As noted, much of his voir dire testimony was provided to him through the prosecutor's leading questions — on his own, Hutchinson was incapable of providing coherent or consistent details. Despite knowing exactly how long he had been in jail, he continually testified that he was unable to state the times at which particular events occurred, preferring instead to present a fuzzy story that could be molded to accommodate facts as they were revealed or inconsistencies as he was confronted with them.
{¶ 206} These deficiencies in Hutchinson's story, while not necessarily apparent to the jury, should have been acutely recognized by the judge, who had access to the police report and voir dire testimony as well as his trial testimony. It is precisely such occasions when the judge is obligated to act as a "thirteenth juror" and ensure that an incredible tale such as Hutchinson's does not lead a jury to convict, especially where the remaining evidence is also highly suspect.
{¶ 207} Hutchinson also testified that Ayers confessed critical details of the murder to him on a Saturday night, when a jury had already been sworn in his trial and opening statements were to begin the next Monday. He then testified that he induced these details by telling Ayers, who had been a CMHA security guard, that his unidentified uncle was a police detective who would testify on Ayers' behalf if only he would confess. Regardless of the deference owed to jury determinations, a story such as this must be carefully scrutinized, especially when emanating from a jailhouse informant with a history of convictions for dishonesty and who is seeking leniency on a number of pending charges. Hutchinson's story also should be deeply scrutinized for its eleventh-hour character; even though we cannot create a rule prohibiting the introduction of all eleventh-hour confessions, this should not stop judges from viewing them with great care.
{¶ 208} The combination of circumstances that cast suspicion on this verdict is almost ridiculously long. With respect to Hutchinson's testimony alone we see that it was offered at an inordinately late hour, revealed not only on the eve of trial, but after the jury had been selected and sworn, that it was conspicuously lacking in any meaningful detail, and was inconsistent in those details it contained. All of this must be considered in light of the admitted dishonesty of Detective Cipo, as well as the judge's finding that both detectives Cipo and Kovach had withheld evidence from prosecutors and had lied about doing so during the suppression hearing. With such knowledge about these detectives, the judge, not to mention the prosecutor, surely should have been skeptical of the sudden appearance of Hutchinson.
{¶ 209} In a related vein, I am also concerned over the prosecutor's representation that he did not question Hutchinson about his testimony before deciding to present it at trial. Rather than deflecting suspicions of collusion, the prosecutor instead showed his willingness to rely on Hutchinson's testimony regardless of its content, and without once stopping to consider that Hutchinson was presented at the last minute by a pair of detectives whom the prosecutor himself had essentially called liars. The prosecutor's conduct, far from inspiring confidence, suggests that he relied on Hutchinson's testimony uncritically.
{¶ 210} Jailhouse informants are often confidence artists, skilled at weaving bits of truthful information into an entire story and convincing people of its truth, even when highly unlikely. Hutchinson's criminal history was consistent with just such a character, and his testimony consistent with concoction. It side-stepped inconsistency by avoiding specifics and constantly claiming lack of knowledge concerning times and circumstances. He alleged the existence of details but never provided them[38] and, when pressed, gave vague and ambiguous answers. These circumstances should raise red flags in the mind of every legal professional.
{¶ 211} In addition to the weakness of Hutchinson's testimony, the weight of the evidence also does not support reliance on Smith's written statement to the police that coincidentally recalls the phone conversations in the same mistaken way that Detective Cipo read the phone records — Smith "remembered" that Ayers called him on both occasions, when in fact the phone records show that Smith initiated both calls.[39] It is extremely suspicious that Hutchinson testified that Ayers admitted calling Smith, despite the fact that the opposite occurred. At some point one must question why each of these witnesses made the same mistake made by Detective Cipo.
{¶ 212} Moreover, further details of Smith's recollection in his written statement are quizzical. He stated not only that Ayers called him, but that he excitedly told him about Brown's death. However, reference to Ayers' excited demeanor was conspicuously missing in the first phone call, made at 12:10 p.m.,[40] and it is quite curious to wonder how he managed to avoid calling Smith for almost two hours in his excited state, as the next call was not placed until nearly 2:00 p.m. This curiosity increases when one attempts to rectify the truth — that Smith in fact called Ayers, and not the opposite — with the substance of the call. Ayers' excited demeanor is inconsistent with the fact that he did not initiate the phone call.[41]
{¶ 213} Not only is Smith's written statement unreliable, his testimony at trial recanting that statement is reasonable and believable. Smith testified that he spoke to Ayers on the phone frequently, and that his best recollection at trial was that he had first spoken to Ayers about Brown's death during the evening. Because the police failed to get phone records after 3:00 p.m. on December 17, 1999, there is no evidence to show whether Ayers and Smith spoke on the phone after this time. His uncertainty about the accuracy of his written statement, the police detectives' documented desire to obtain that statement, and the statement's coincidental similarity to Detective Cipo's mistaken view of the phone record all cast doubt on its reliability. Copious research confirms that misleading suggestions can trigger inaccurate memories.[42]
{¶ 214} Without Hutchinson's testimony and Smith's written statement, both of which have been shown to be unreliable, the State's case against Ayers becomes extremely weak. Even with that evidence the jury was deadlocked for a time, and returned a verdict only after the judge instructed them on the importance of returning a verdict, pursuant to State v. Howard.[43] The remainder of the State's case shows a fluctuating reliance on inconclusive and inconsistent evidence punctuated by evidence of poor investigation.
{¶ 215} The police initially focused on Ayers because he claimed that Brown called and asked him for assistance but her phone records failed to show such a call. However, at least three other people claimed to have received a phone call from Brown during the time period covered by the police request, and none of these calls are in the record either. In fact, the phone records omitted as many as five calls between Brown and Ayers, Cleo McDowell, Tommie Williams, Carol Brown, and Lawrence Reid. Despite the fact that the phone record was obviously incomplete, the State continued to point blame at Ayers, and only Ayers, for the lack of a record. Moreover, even though Brown's phone record was unnecessary because Harris, and later the security video, corroborated Ayers' statement that the two of them visited Brown in order to help her, the prosecutor continued to claim during closing argument that Ayers never received a phone call from Brown and, apparently, that he'd never gone to help her. This argument reeks with incoherence, since much of the State's theory is in fact based on accepting the premise that Ayers went to assist Brown earlier in the morning. The fact that the prosecutor would stoop to such inconsistent argument is further testament to the underlying weakness of the State's case.
{¶ 216} As noted, the security video is consistent with Ayers' story — it first shows him and Harris arriving in the lobby, Ayers exiting to the key area, and returning to re-enter the elevator with Harris. About five minutes later the tape shows Ayers returning to the lobby alone. The trips presumably correspond to Ayers obtaining and then returning the keys to Brown's apartment and, although this does not prove his innocence, it is consistent with the story he told police and certainly casts doubt upon the police detectives, who interrogated him based upon their belief that he was lying about his presence on the video. It is also worth noting that Ayers does not appear nervous or secretive on the video, as he might if he had performed some sleight with the keys. Furthermore, the record does not indicate whether further security video was available, but it does not appear that anyone checked the video records between approximately 6:00 a.m. on December 17, 1999 until Brown's body was discovered to determine whether Ayers appeared in the lobby or the key area at any later time, nor did police check the key box to see if Brown's key was there when they arrived at the scene.
{¶ 217} Harris believed that Ayers locked Brown's door, and he reported the same to police. The video does show conduct consistent with him retrieving and returning a key. Tommie Williams testified that when he went to visit Brown at 11:00 a.m. on December 17, 1999, the door was locked. However, when Sarah Harris went to visit Brown at 2:30 p.m. and discovered the body, the door was unlocked. The State had no adequate theory for this evidence, suggesting either that the door was unlocked, but stuck, so that Williams could not open it, or that Ayers somehow, and for some reason, returned to Brown's apartment to unlock the door sometime between 11:00 a.m. and 2:30 p.m.
{¶ 218} The police reports indicate that a coroner's unit removed Brown's body from her apartment at about 6:00 p.m. on December 17, 1999, but the record contains no report from this unit or any indication that anyone made an estimate of the time of Brown's death at the scene.[44]
The autopsy was performed at 10:45 a.m. on December 18, 1999, at which point the coroner reported that "rigor is fully developed and the posterior lividity is fixed." The report did not indicate any evidence of a shift in lividity, even though Brown's body, according to the State's theory, had been on its side, and not on its back, for fourteen to fifteen hours prior to being moved.
{¶ 219} Furthermore, the photographs of the scene show a portable telephone at the foot of the reclining chair Brown was said to have occupied, although her body was found several feet behind that chair, in proximity to a wall phone. For Hutchinson's story to be believable, Brown must have risen from her chair for some reason during her confrontation of Ayers, because it makes no sense to believe that Ayers transported her to the location shown in the photographs before striking and killing her. The only apparent explanation is that Brown was attempting to reach the phone, but this makes no sense when one is faced with the evidence of her infirmity and the proximity of the portable phone in the photograph.
{¶ 220} Because the State's evidence lacked credibility in critical areas and the remaining evidence does not lead to a convincing theory of guilt, I would sustain the eighth assignment of error and remand this case for a new trial.
Combined Error
{¶ 221} The foregoing discussion adequately demonstrates that the combination of errors and improprieties mounted to create an unfair result here. The police focused their investigation on Ayers based upon a belief that he lied about phone records, although several other phone calls also should have appeared on the same records but did not, and upon the inexplicable failure to comprehend the need to decode the security video for meaningful viewing. The prosecutor first withheld evidence from Ayers and disclosed it in tiny portions as trial approached, well after the initial investigation had been conducted and too late to pursue many avenues of further investigation.
{¶ 222} The late disclosures of inculpatory evidence necessarily cast doubt on the reliability of that evidence because one can rightly question whether such evidence actually existed prior to its disclosure. This concern is heightened here because of the undisputed dishonesty and misconduct engaged in by the police detectives. The same concern affects analysis of the failure to investigate other leads and the failure to disclose evidence to the defense. The lack of investigation and failure to disclose combined with the lack of credibility and reliability of the State's most critical evidence of guilt mandates a remand for a new trial. I would sustain the fifth assignment of error.
Sentencing
{¶ 223} Although I would find assignments of error nine, ten, and eleven moot based upon my resolution of other issues, I find it necessary to address the majority's opinion on sentencing before concluding. Without elaborating, I disagree with the majority's statement that a judge who imposes the maximum sentence has necessarily rejected imposition of the minimum,[45] and note that such a presumption is particularly unwarranted when the judge has failed to comply with statutory requirements for imposing the maximum sentence, as the majority finds. It is beyond my comprehension how the judge showed her consideration of one statutory requirement by exhibiting disregard for another.
{¶ 224} Next, I disagree with any suggestion by the majority that the judge's "felony sentencing findings" checklist can be used to show compliance with R.C. 2929.19(B), which requires consideration of appropriate factors at the sentencing hearing. Unless this checklist is made at the hearing, presented to the defendant and discussed with him on the record, the form does not support the judge's compliance with R.C.2929.19(B).[46] Further, the majority's statement that it would have affirmed the sentence imposed had the judge included the proper checkmark on the sentencing findings list is inappropriate, and I also disagree with any implication in that statement that resentencing hearings can be limited proceedings. R.C. 2929.19(A)(1) sets forth the same requirements for all such hearings, regardless of whether they are original sentencing proceedings or resentencings after remand.[47]
 Conclusion
{¶ 225} I recognize that a criminal defendant's constitutional right to discover evidence in the prosecution's possession is limited. One early rationale behind denial of discovery was that a defendant presented risks of witness tampering or would manufacture perjured evidence and testimony if shown the prosecution's evidence, that these risks were greater than those presented in civil cases, and thus pretrial discovery in criminal cases would defeat, rather than advance, the search for truth.[48] The Tune court rejected the idea that liberal discovery would aid the judicial search for truth, finding that widespread "disrespect for the law" and a "frontier" mentality made it impossible to apply more civilized rules in American courts.[49]
{¶ 226} The Tunecourt's view was remarkably similar to that expressed in Rhoads at the turn of the twentieth century — that criminal justice was a battlefield in which judges stood not as neutrals residing over disputes between the prosecutor and the accused, but as guardians charged with protecting the public from the criminals brought before them. Such views can hardly expect to inspire respect for the law through biased implementation of a criminal justice system. Nevertheless, such outmoded views persist,[50] although experience should now tell us that it is not only the accused who might tamper with evidence or suborn perjury; highly publicized cases in recent years have shown not only frequent incidents of government misconduct, but regular patterns of such misconduct within government institutions.[51]
{¶ 227} While Crim.R. 16 now allows defendants to obtain discovery and requires prosecutors to justify withholding discoverable information,[52] the prosecutor is still constitutionally able to deny access to police investigatory files, the remaining rationale being the lack of a reciprocal obligation for the defendant to provide access to the prosecution.[53] This reasoning attempts to counteract the defendant's right against self-incrimination by creating a work product theory that presupposes that all government actors, most notably law enforcement officials, are not independent parties gathering information while carrying out their general duties to investigate crime, but are instead the agents of the prosecution investigating crime for the sole purpose of building a case against the particular defendant.[54]
{¶ 228} There is no reason to believe that the accused's right to avoid self-incrimination was intended to be effective only upon granting the government a countervailing right to withhold evidence. The rights of the accused are designed to protect the individual from a government with far greater resources, a goal that is thwarted when one shifts the balance back in the government's favor. Allowing the State to withhold evidence and police its own disclosures leads to the gamesmanship the Criminal Rules sought to eliminate.[55]
{¶ 229} Because the prosecution is considered the sole proprietor of law enforcement investigatory material, it is consequently charged with the constitutional duty to divulge all "material" exculpatory evidence to the defendant. This duty, as it exists, has the unfortunate effect of granting the prosecutor discretion to determine what evidence is material and exculpatory. The problem with this arrangement is immediately apparent; regardless of prosecutors' own efforts and courts' occasional attempts to remind them of their public duties,[56] the fact remains that a prosecutor is primarily interested in convicting charged defendants and has an undeniable conflict of interest when asked to divulge exculpatory evidence.
{¶ 230} In all, it can fairly be said that if a prosecutor withholds evidence in advance of trial, a defendant is denied all effective use of it, because the appellate and postconviction remedies available can never recover the value lost. For Brady to have meaning, it must be applicable and enforceable at the trial level, when avenues for investigation are still open and the defendant is still clothed with the presumption of innocence.
{¶ 231} We must assess Ayers' claims with these aspects and consequences of the constitutional rule in mind, or we risk denying him the right of fair trial, which is the principle sought:
 {¶ 232} "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: `The United States wins its point whenever justice is done its citizens in the courts.'"[57]
{¶ 233} Withheld evidence, by its very nature, deprives the defendant of the ability to know it is being withheld, yet the rule seems to be that prosecutors cannot be questioned without some proof of concealment.
{¶ 234} The presumption of innocence afforded defendants erodes early in the trial proceedings and, in Ayers' situation, is reduced to relying on adequate police investigation to discover evidence that will eliminate him as a suspect, just as that investigation targeted him in the first place. Police and juries both can be swayed by images of grisly crime scenes such as those portrayed in photographs here and come to the conclusion that someone must be punished, despite the lack of credible evidence linking those scenes to the defendant. I am convinced that Ayers was denied a fair trial, and further convinced that more investigation is warranted in this case. It is unfortunate that so much evidence that could have been collected is now lost, but I still believe it important that someone, somewhere, reopen investigation into this crime.
{¶ 235} I would sustain assignments of error one, two, three, five, six, and eight, and remand for further proceedings.
[1] State v. Heinish (1990), 50 Ohio St.3d 231, 553 N.E.2d 1026, syllabus; State v. Scudder, 71 Ohio St.3d 263, 268-269, 1994-Ohio-298,643 N.E.2d 524.
[2] It is amazing that none of the law enforcement officials or prosecutors apparently considered the security videos important to the investigation.
[3] At trial, CMHA Detective Morgan stated that NASA decoded part of the videotape and delivered it to him, ready for viewing, as early as August 2000. Apparently, however, neither police nor prosecutors requested that NASA prepare the entire video for viewing, and Ayers had to request that it be fully decoded. When this was done, inaccuracies in the video's time recorder appeared, and Ayers and Harris were viewed together at approximately the time they reported assisting Brown.
[4] Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694.
[5] The contents of these reports will be discussed infra.
[6] Kelly v. Kelly (May 4, 1977), Hamilton App. Nos. C-76247, C-76248; Sun Life Assur. Co. of Canada v. Belmont Properties, Inc. (Dec. 15, 1982), Summit App. Nos. 3346, 3347, 3348.
[7] (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.
[8] United States v. Bagley (1985), 473 U.S. 667, 676,105 S.Ct. 3375, 87 L.Ed.2d 481.
[9] Even if one wishes to forgive the prosecutor for failing to fulfill his duty to speak plainly to the judge about his conduct of the case (i.e., to admit the willful nature of the discovery violation), that forgiveness then renders his subsequent reliance upon the detectives (who we must now consider dishonest) inexcusable, a point to be considered when examining, inter alia, the lack of scrutiny given to the testimony of Donald Hutchinson, the jailhouse informant.
[10] As will be discussed infra, this is the state of current criminal discovery rules.
[11] See, also, State v. Branham (1995), 104 Ohio App.3d 355, 362-363,662 N.E.2d 54 (defendants' expert's testimony excluded despite lack of misconduct on part of defense lawyer).
[12] It is most odd that CMHA police themselves appeared unfamiliar with the security equipment used in CMHA buildings.
[13] Brady, 373 U.S. at 87. The same standard is stated in Crim.R. 16(B)(1)(f), but there is no indication that this rule is intended to be broader than the constitutional standard.
[14] United States v. Bagley, supra, 473 U.S. at 682.
[15] United States v. Agurs (1976), 427 U.S. 97, 112-113,96 S.Ct. 2392, 49 L.Ed.2d 342.
[16] For the sake of clarity, it should be noted that the prosecutor's case file was not turned over or sealed as an exhibit; the exhibits consist of the collected written reports of the investigating police officers, as well as documents retrieved during the investigation, such as the phone logs. There is no traditional work product here, such as the prosecutor's notes on how to try the case, witness examination strategies, or theories of guilt. One quite overstates the circumstances in stating that the prosecutor's file was turned over to the court or to the defense.
[17] aka Jerritt Ward, Jerritt A. Ward.
[18] In fact, review of public records shows evidence that Darrin Ward was convicted of the offense of gross sexual imposition in 1990. Although I believe this court can judicially notice such evidence, State v. Mays (1992), 83 Ohio App.3d 610, 614, 615 N.E.2d 641, I am to some extent unconcerned with the strictures of the record at this point, since my goal in this dissent is to stimulate further inquiry into this case as much as to show that Ayers is currently entitled to relief. I have no doubt but that the existing record supports Ayers' claims for relief, and if I stray from that record in pursuit of some other purpose, it should not affect the legal merits of Ayers' claim in this appeal.
[19] Detective Kovach testified that police could not initiate questioning of Jeritt Ward because he had retained a lawyer; a police officer should know, however, that Sixth Amendment rights on pending charges do not attach to investigations of separate crimes. Maine v. Moulton (1985), 474 U.S. 159, 178-179, 106 S.Ct. 477,88 L.Ed.2d 481.
[20] As noted, the State failed to disclose this evidence to Ayers until seeking his hair samples in August 2000, which did not match any of the hairs found at the scene.
[21] I note that the record shows that the jury requested a transcript of Smith's testimony and written statement during its deliberations.
[22] Moreover, the prosecutor essentially forced Smith to repeat the content of his written statement under the guise of refreshing his recollection, despite the fact that the totality of Smith's testimony indicates a distinct lack of recollection. The prosecutor's questioning also resembled impeachment of one's own witness without a showing of surprise and affirmative damage, in violation of Evid.R. 607. See State v. Keenan (1993), 66 Ohio St.3d 402, 412, 613 N.E.2d 203.
[23] Moreover, Smith's testimony is another piece in the pattern of alleged misconduct on the part of detectives Cipo and Kovach which, as discussed infra, cannot be ignored.
[24] Bagley, 473 U.S. at 676.
[25] Bagley, 473 U.S. at 682-683.
[26] State v. Scudder, supra, 71 Ohio St.3d at 269.
[27] This was the Thanksgiving holiday weekend; the jury had been selected and sworn on Wednesday, November 22, 2000, and opening statements were scheduled for Monday, November 27, 2000.
[28] The coroner did not seek to recover microscopic trace evidence from Brown's wounds that might have shown the composition of the murder weapon.
[29] Or had at least informed the prosecutor that Hutchinson would agree to any story he was asked to tell.
[30] Maine v. Moulton, supra, 474 U.S. at 176.
[31] Id. at 177 n. 13, citing United States v. Henry (1980),447 U.S. 264, 271 n. 9, 100 S.Ct. 2183, 65 L.Ed.2d 115.
[32] Moulton, 474 U.S. at 173-174,176.
[33] Id. at 176 n. 12.
[34] I would judicially notice that all criminal charges against Hutchinson were nolled and dismissed in Cases CR-396046 and CR-396813, and Judge Nancy Russo found he was not a probation violator and his probation was terminated with all pending fines and costs vacated in Case CR-377015.
[35] State v. Stallings, 89 Ohio St.3d 280, 289, 2000-Ohio-164,731 N.E.2d 159, quoting State v. Getsy, 84 Ohio St.3d 180, 193,1998-Ohio-533, 702 N.E.2d 866.
[36] State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 415,485 N.E.2d 717.
[37] The police reports indicate that a cleaning company had visited Brown days before her murder and had offered to clean her apartment for $700. Despite testimony from a company representative that no such request was made, several witnesses, including Brown's relatives, reported that she had told them of the visit and the $700 request prior to her death.
[38] Unfortunately this tactic was not limited to the jailhouse informant. Cleveland Police Officer Timothy Higgins testified that David Ayers and Sarah Harris gave conflicting stories when interviewed at the scene, but failed to testify to any specific inconsistencies.
[39] Regardless of the fact that Smith was asked to hedge on the source of the phone calls at the end of his statement (presumably this was done at Detective Kovach's initiative, because her reports indicate an awareness that Smith placed the calls), his initial assertions in the written statement boldly state that Ayers called him, that he told Ayers he would call him back, but that Ayers called again. Such a recollection is in direct conflict with the phone logs.
[40] Again, I note that Smith's written statement specifically mentions receiving a call from Ayers at about 12:10 p.m., despite the fact that the call had been made three months earlier and Detective Cipo denied showing Smith the telephone records.
[41] Indeed, in closing argument the prosecutor stated that Ayers called Smith and continued to urge the theory that he made the call in an excited state to tell Smith of Brown's death, despite the fact that this scenario was impossible upon the facts.
[42] See, generally, Hallisey, Experts on Eyewitness Testimony in Court — A Short Historical Perspective (1995), 39 How.L.J. 237, 245 (discussing work of prominent memory researcher Dr. Elizabeth F. Loftus); Davis Follette, Foibles of Witness Memory for Traumatic/High Profile Events (2001), 66 J.Air L. Com. 1421, 1521 (also discussing Loftus' research).
[43] (1989), 42 Ohio St.3d 18, 537 N.E.2d 188, paragraphs one and two of the syllabus.
[44] This does not mean that no such report exists. The police file included in the record here refers to evidence that is not contained in this record, and should not purport to be the complete investigatory file, or even the complete police file in this case. In particular, the police reports refer to photographs of the crime scene that were not included in the file and were not presented as exhibits at trial.
[45] State v. Zimmerman (Dec. 6, 2001), Cuyahoga App. No. 79011.
[46] State v. Gaddis, Cuyahoga App. No. 77835, 2002-Ohio-1830, at q7-9.
[47] State v. Steimle, Cuyahoga App. Nos. 79154, 79155, 2002-Ohio-2238, at q14-16.
[48] State v. Tune (1953), 13 N.J. 203, 210-211, 226, 98 A.2d 881; State v. Rhoads (1910), 81 Ohio St. 397, 423-424, 91 N.E. 186.
[49] Tune, 13 N.J. at 219.
[50] State ex rel. Steckman v. Jackson (1994), 70 Ohio St.3d 420, 429,639 N.E.2d 83 (Witness intimidation is now more real than imagined.).
[51] See, e.g., Natl. Assn. of Criminal Defense Lawyers, Inc. v. United States Dept. of Justice (C.A.D.C. 1999), 182 F.3d 981, 982 (discussing allegations and investigation of improprieties in FBI laboratories); United States v. Los Angeles (C.A.9, 2002), 288 F.3d 391, 396 (discussing investigation into misconduct in Los Angeles Police Department's Rampart Division); In the Matter of an Investigation of the W. Virginia State Crime Laboratory, Serology Div. (1993), 190 W. Va. 321, 438 S.E.2d 501
(discussing multiple incidents of misconduct by laboratory serologist Fred S. Zain); Ex Parte Davis (Tex.Crim.App. 1997), 957 S.W.2d 9
(discussing further incidents of misconduct following Fred Zain's relocation from West Virginia to Bexar County, Texas).
[52] Crim.R. 16(B)(1)(e).
[53] Tune, 13 N.J. at 211; Steckman, 70 Ohio St.3d at 428-429.
[54] Id., 70 Ohio St.3d at 434-435. I again point out, with reference to the discovery in this case, that it is unfair to allow the prosecutor to claim that police are his agents for one purpose, but independent actors for another. The prosecutor cannot withhold police investigation material as his work product and then claim that he is not responsible for police misconduct in denying the defendant's right to discovery.
[55] State v. Howard (1978), 56 Ohio St.2d 328, 333, 10 O.O.3d 448, 383 N.E.2d 912.
[56] See, e.g., Agurs, 427 U.S. at 108 (the prudent prosecutor will resolve doubtful questions in favor of disclosure); Steckman,70 Ohio St.3d at 435-436 (in light of admittedly sweeping rulings, the court stated that we also believe that we should make clear our concern that there be strong enforcement of Crim.R. 16(B)(1)(c) by trial courts * * *).
[57] Brady, 373 U.S. at 87.